STATE of Minnesota, Respondent,

v.

Robert D. KENDELL, Appellant.

No. A05–0427.

Supreme Court of Minnesota.

Nov. 9, 2006.

Bridget Kearns Sabo, Asst. State Public Defender, Minneapolis, MN, for Appellant.

Mike Hatch, Attorney General, St. Paul, MN, Amy Klobuchar, Hennepin County Attorney, Jean E. Burdorf, Asst. County Attorney, Minneapolis, MN, for Respondent.

## OPINION

ANDERSON, G. BARRY, Justice.

A jury found appellant Robert D. Kendell guilty of first-degree premeditated murder and second-degree intentional murder for the shooting death of Robert Hannah. The jury also found Kendell guilty of three counts of attempted first-degree murder, three counts of attempted second-degree murder, three counts of first-degree assault, and one count of child endangerment for the shootings of Mandie Coburn and her two children, Yasmeen Coburn–Bryant and Patrick Walker. The district court sentenced Kendell to life imprisonment for first-degree premeditated murder, 240 months for attempted first-degree murder of Coburn, 240 months for attempted first-degree murder of Yasmeen, and 240 months for attempted first-degree murder of Patrick, with the sentences to run consecutively. The district court also sentenced Kendell to a concurrent term of 365 days for child endangerment. Kendell appeals, arguing that: (1) the evidence was insufficient to prove beyond a reasonable doubt that he premeditated the murders of Hannah, Yasmeen, and Patrick; (2) the district court erred when it denied Kendell's motion to sever the charges relating to Hannah; (3) the district court erred when it submitted to the jury a special interrogatory regarding

a fact used to enhance Kendell's sentence; (4) Kendell was denied due process because the state failed to provide adequate notice of its intent to seek an upward sentencing departure and failed to include the departure factor in the indictment; (5) the district court erred when it permitted witnesses to testify that, after the shootings, Kendell said, "I'm going to hell"; and (6) the district court erred when it permitted a recording of two 911 calls to be played during the state's closing argument. We affirm.

On December 17, 2003, Robert Hannah was found shot to death in the entryway of his apartment in Brooklyn Park, Minnesota. On the same day, police also found Mandie Coburn and two of her children shot and seriously injured in the apartment next door. Coburn and her children survived the shootings.

In September 2002, Robert Kendell moved into apartment 304, Mandie Coburn's home, with Coburn and her two children, Yasmeen and Patrick. In 2003, Coburn became pregnant with Kendell's child and, on December 3, gave birth to a girl, Charess. After Charess was born, Coburn and Kendell began arguing about Charess's care. At trial, Kendell's cousin testified that prior to the shootings Kendell had said that he loved Coburn and her children but that he would kill all three of them if Coburn "kept playing with him about his baby."

At approximately five o'clock in the evening on December 17, 2003, Coburn and Kendell got into an argument about who was to watch Charess that evening. Coburn testified that Kendell began swearing at her and that she eventually told him to leave. Kendell agreed to leave and called his friend, Marques Bates, who agreed to

pick up Kendell and his belongings at the apartment. After assisting Kendell with his packing, Coburn left the apartment to visit her friend, Erica McClellan, who lived nearby.

At approximately 8:30 p.m., Kendell went to McClellan's apartment building and told McClellan that his ride had arrived and that Coburn should come home so the children would not be alone. Coburn, angry that Kendell had left Charess alone, returned to her apartment with Kendell. On the way back from McClellan's apartment, Coburn told Kendell that she was going to call the police and report that he had left her children unattended.[1]

Once back at the apartment, Kendell asked Coburn if she "wanted to be with him," and Coburn said no. According to Coburn, Kendell then said that the only way Coburn "was going to leave him was in a body bag." At that point, Coburn called 911. While she was on the phone in the kitchen, Kendell shot her once in the chest. After the first shot, Kendell's gun jammed, and Coburn hung up the phone, hoping that doing so would calm Kendell down. As Kendell attempted to fix the gun, Coburn called 911 a second time. While Coburn was on the second call, Kendell shot her two more times.

After shooting Coburn, Kendell left the kitchen and walked toward the back bedroom where the children were. Coburn heard gunshots coming from the back bedroom. Coburn then saw Kendell head toward the apartment door, throw his jacket hood over his head, and leave the apartment. After his departure, Coburn remained on the telephone with the 911 dispatcher. A recording of the 911 calls was

1. At the time, Yasmeen was seven years old; Patrick was three years old; and Charess was two weeks old.

played at trial and corroborates significant portions of Coburn's testimony.

Police officers arrived and proceeded to the third floor, where they noticed that the door to apartment 303 was open and a man, Robert Hannah, the resident of apartment 303, was lying in the entryway. Hannah was pronounced dead at the scene. The officers also observed wood from the door frame of apartment 303 strewn about the common area in front of the doorway. The door frame and the area around the door's molding were broken, and the deadbolt was extended. At trial, Officer Aaron Albright testified that the door appeared to have been forced open.

Additional officers arrived on the scene, and several officers turned their attention to apartment 304.[2] Upon finding the door to apartment 304 locked, Officer Michael Ploumen kicked in the door, and several officers entered the apartment. Inside, the officers found Coburn seated on the kitchen floor, conscious but bleeding from the chest. Two officers testified that Coburn told them that her boyfriend, Robert Kendell, had shot her. The officers also found Yasmeen, Patrick, and Charess on the bed in the back bedroom. Yasmeen and Patrick had been shot, but Charess was uninjured. The officer who attended to Yasmeen testified that, when asked who had shot her, Yasmeen replied, "It was daddy."[3]

At trial, Marques Bates testified that between 8:15 p.m. and 8:30 p.m. on December 17 he arrived at Coburn's building and helped Kendell load his belongings into Bates's car. Bates then drove to another apartment building while Kendell went to get Coburn from McClellan's apartment.

When Bates returned, Kendell got into Bates's car, and they drove off. Not long after Kendell got into the car, Bates and one of the passengers in the car heard Kendell say, "I'm going to hell." Bates drove Kendell to his aunt's house where he transferred a few garbage bags containing his belongings to another car, got into the car, and drove off. The next day, Kendell saw a photograph of himself on the news. On the evening of December 18, Kendell turned himself in to the police.

As a result of the shooting, Coburn suffered injures to her chest, left arm, right buttock, right leg, and left thigh. Yasmeen sustained a single gunshot to her right buttock. Patrick was hit by three separate gunshots and incurred injuries to his right hip and left leg. An emergency room physician who examined Coburn, Yasmeen, and Patrick after the shootings testified that all three had sustained life-threatening injuries.

An autopsy of Hannah's body revealed that he had been shot twice, first in the abdomen and then in the back. The medical examiner who performed the autopsy testified that the wound to Hannah's back was fatal and that Hannah could have lived only a couple of minutes after receiving it. The examiner also testified that Hannah's injuries were consistent with the door to his apartment opening, Hannah receiving the abdomen wound, and then turning and being shot in the back.

The state presented testimony of two of Hannah's neighbors from apartment 301 who testified that they visited Hannah at his apartment on the evening of December 17. One of the neighbors, Covetta Thaggard, stated that while she was at Han-

---

**2.** A diagram of the floor plans of apartments 303 and 304 reveals that the entrances to the two apartments are immediately adjacent to each other, separated by no more than a few feet.

**3.** Yasmeen refers to Kendell as "daddy."

nah's apartment she heard a noise that sounded like a firecracker coming from apartment 304. Thaggard further testified that, five or six minutes after leaving Hannah's apartment at approximately. 8:30 p.m., she heard noises in the hallway outside her apartment. She described the noises as sounding like an object banging against a wall or a door and then a "pop." The other neighbor also testified that she heard noises from the hallway that sounded like banging against a wall followed by three gunshots. Both women testified that Hannah was alive when they left his apartment. Thaggard also testified that she did not notice anything unusual about Hannah's door when she left his apartment.

Kurt Moline, a forensic scientist at the Minnesota Bureau of Criminal Apprehension, examined the bullets and casings recovered from apartments 303 and 304. At trial, Moline testified that one of the bullets found in apartment 303 had features matching the bullets found in apartment 304, indicating that the bullets found in the two apartments were fired from the same gun. The gun used in the shootings was not recovered by police.

A grand jury returned an indictment charging Kendell with 12 counts arising out of the shootings—first- and second-degree murder for the death of Hannah, attempted first- and second-degree murder and first-degree assault for the shootings of Coburn, Yasmeen, and Patrick, and child endangerment with respect to Charess. Kendell moved to dismiss the indictment on the grounds that the offenses charged did not arise from a single behav-

ioral incident. In the alternative, Kendell requested that the charges relating to Hannah be severed from the remaining 10 counts. The district court denied the motion, concluding that the offenses arose from a single behavioral incident and that joinder of the offenses would not prejudice Kendell. Subsequently, following a jury trial at which Kendell neither testified nor presented any witnesses, Kendell was found guilty of all 12 counts.

Before trial, the state notified Kendell's attorney that it intended to seek an upward sentencing departure under Minn. Stat. § 609.1095 (2004) (amended 2005), the dangerous-offender statute.[4] To address concerns arising from *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), the district court agreed to submit a special interrogatory to the jury regarding the facts necessary to enhance Kendell's sentence under section 609.1095, subd. 2. Consequently, after the jury returned its verdict, the district court submitted a special interrogatory to the jury asking, "Is the defendant, Robert Diablo Kendell, a danger to public safety?" The state then presented evidence regarding Kendell's two prior assault convictions and his prior conviction for felon in possession of a firearm. Kendell's attorney objected to the use of the special interrogatory, arguing that the court lacked authority to implement such a procedure. After deliberating, the jury, on a special verdict form, found Kendell to be a danger to public safety because of his "long history of escalating violent crime."

---

4. Prior to its amendment in 2005, section 609.1095, subd. 2, provided that, when a person is convicted of a violent felony and is at least 18 years old at the time of the commission of the offense, a court may impose an upward durational departure if: (1) "the court determines on the record at the time of sentencing that the offender has two or more prior convictions for violent crimes"; and (2) "the court finds that the offender is a danger to public safety and specifies on the record the basis for the finding." Minn.Stat. § 609.1095, subd. 2 (2004).

Pursuant to this finding, the district court sentenced Kendell to consecutive terms of 240 months for each of the three attempted first-degree murders, an upward departure from the presumptive sentences.[5] The court also sentenced Kendell to life imprisonment for first-degree murder, with that sentence to run consecutively to the sentences for attempted murder. Finally, the court imposed a concurrent 365–day sentence for child endangerment. This direct appeal followed.

### I.

We first address Kendell's contention that the evidence presented at trial was insufficient to prove beyond a reasonable doubt the element of premeditation with respect to Hannah's murder and the attempted murders of Yasmeen and Patrick.[6] When reviewing a claim of evidentiary insufficiency, we view the evidence in the light most favorable to the verdict and assume that the fact finder disbelieved any contrary evidence. *State v. Leake*, 699 N.W.2d 312, 319 (Minn.2005), *cert. denied*, —— U.S. ——, 126 S.Ct. 745, 163 L.Ed.2d 583 (2005). "The verdict will not be overturned if, giving due regard to the presumption of innocence and to the prosecution's burden of proving guilt beyond a reasonable doubt, the jury could reasonably have found the defendant guilty of the charged offense." *·Id.*

A person who "causes the death of a human being with premeditation and with intent to effect the death of the person or of another" is guilty of first-degree murder. Minn.Stat. § 609.185 (2004). Premeditation means "to consider, plan or prepare for, or determine to commit, the act * * * prior to its commission." Minn. Stat. § 609.18 (2004). "A finding of premeditation does not require proof of extensive planning or preparation to kill, nor does it require any specific period of time for deliberation." *State v. Cooper*, 561 N.W.2d 175, 180 (Minn.1997). However, the state must prove that, before the commission of the act but after the defendant formed the intent to kill, some appreciable time passed during which the defendant considered, planned, or prepared to commit the act. *Leake*, 699 N.W.2d at 319.

"Premeditation is a state of mind and, thus, generally proven through circumstantial evidence." *Id.* A conviction based on circumstantial evidence stands only when the circumstances form "a complete chain which, in light of the evidence as a whole, leads so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt." *State v. Wahlberg*, 296 N.W.2d 408, 411 (Minn.1980).

"[A] defendant's actions before and after the murder are relevant to the question of premeditation." *Leake*, 699 N.W.2d at 321. We have recognized three categories of evidence relevant to an inference of premeditation: (1) planning activity, i.e., " 'facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing' "; (2) motive evidence, i.e., " 'facts about the defendant's prior relationship and conduct with the victim from which *motive* may be in-

---

5. For consecutive sentencing, the presumptive duration of Kendell's sentences was 220 months for the attempted murder of Coburn, 180 months for the attempted murder of Yasmeen, and 180 months for the attempted murder of Patrick. *See* Minn. Sent. Guidelines II.F., II.G, VI.

6. Kendell does not challenge the sufficiency of the evidence of premeditation as to the attempted murder of Coburn.

ferred' "; and (3) evidence as to the nature of the killing, i.e., facts " 'from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.' " *State v. Moua,* 678 N.W.2d 29, 40–41 (Minn.2004) (quoting *State v. Moore,* 481 N.W.2d 355, 361 (Minn.1992)).

■ The record in this case contains ample evidence of premeditation. The most obvious evidence of premeditation in the attempted murders of Yasmeen and Patrick is Kendell's prior threat to kill Coburn's children. At trial, Kendell's cousin testified that Kendell told her that he would kill Coburn and her children if Coburn "kept playing with him about his baby." Motive evidence supporting a finding of premeditation "includes prior threats by the defendant to injure the victim." *Moua,* 678 N.W.2d at 41.

The nature of the injuries to Yasmeen and Patrick also supports the jury's finding of premeditation. Both children sustained life-threatening injuries. Patrick was hit by three separate gunshots. Evidence of multiple gunshot wounds can support a finding of premeditation. *Id.* at 39. In addition, the fact that, after shooting Coburn, Kendell walked down the hallway to the back bedroom, away from the front door of the apartment, to shoot Yasmeen and Patrick, reveals that he had time to consider the attack before its commission. *See Bangert v. State,* 282 N.W.2d 540, 544 (Minn.1979).

Finally, Kendell's behavior after the shootings reveals a cool, calm demeanor consistent with premeditation. Coburn testified that Kendell took the time to pull his jacket hood over his head, presumably to conceal his identity, before leaving her apartment. Evidence presented at trial also indicated that Kendell paused to lock the door to the apartment after the shoot-

ings. The totality of the evidence, viewed in the light most favorable to the jury's verdict, is sufficient to support the jury's finding that Kendell premeditated the murders of Yasmeen and Patrick.

■ The record also reveals sufficient evidence to support the jury's finding that Kendell premeditated Hannah's murder. At trial, the state's theory of motive was that Kendell killed Hannah to avoid apprehension for the shootings in apartment 304. The state posited that Hannah heard the shots in 304, opened his apartment door, saw Kendell leaving 304, and quickly shut the door. The state theorized that Kendell noticed Hannah and broke down his door and killed him to eliminate him as a potential witness. Consistent with this theory, evidence presented at trial showed that Hannah's door had been forced open. Breaking down a door to gain access to a person in order to shoot him reveals advance planning and is inconsistent with Kendell's theory that the shooting was a "rash impulse."

■ The presence of motive evidence strengthens the inference that Kendell premeditated the killing. *See Moore,* 481 N.W.2d at 362. "Motive evidence includes * * * plans or desires of the defendant that would have been facilitated by the victim's death * * *." *Moua,* 678 N.W.2d at 41. Here, evidence showing that Kendell shot three people in the apartment adjacent to Hannah's apartment immediately prior to Hannah's death supports an inference that Kendell killed Hannah to eliminate him as a potential witness and to avoid apprehension for the shootings in apartment 304.

■ We have also recognized that the number of times the defendant used the murder weapon and the number of wounds inflicted are relevant to an assessment of premeditation. *Id.* at 41. In ad-

dition, premeditation may be inferred from evidence showing "that 'wounds were deliberately placed at vital areas of the body.'" *State v. Chomnarith*, 654 N.W.2d 660, 665 (Minn.2003) (quoting Moore, 481 N.W.2d at 361). Hannah was shot twice, once in the abdomen and once in the back, both vital areas. The autopsy indicated that Hannah likely turned away from his attacker after the first shot and was then shot in the back. A single shot squarely in the back can support a finding of premeditation because it indicates that the shooter took careful aim at the victim. *See State v. Johnson*, 616 N.W.2d 720, 726 (Minn. 2000). The evidence relating to Hannah's murder is consistent with an inference of premeditation and is inconsistent with any other rational explanation. Accordingly, we hold that the evidence presented at trial was sufficient to prove beyond a reasonable doubt the element of premeditation with respect to Hannah's murder and the attempted murders of Yasmeen and Patrick.

## II.

 We next address Kendell's contention that the district court erred when it denied his motion to sever the counts relating to Hannah's murder from the other counts charged.[7] We take this opportunity to clarify the appropriate standard for reviewing a district court's denial of a motion to sever offenses under Minn. R.Crim. P. 17.03, an issue which we have not squarely addressed in previous cases. A district court's decision on severance involves the same inquiry used to decide whether multiple offenses arose from a single behavioral incident for purposes of Minn.Stat. § 609.035 (2004). *See State v. Profit*, 591 N.W.2d 451, 458 (Minn.1999),

*cert. denied*, 528 U.S. 862, 120 S.Ct. 153, 145 L.Ed.2d 130 (1999); *State v. Dukes*, 544 N.W.2d 13, 20 (Minn.1996). The single-behavioral-incident analysis presents a mixed question of law and fact. *See State v. Marchbanks*, 632 N.W.2d 725, 731 (Minn.App.2001). Generally, we review mixed questions of law and fact de novo. *See, e.g., Heine v. Simon*, 702 N.W.2d 752, 761 (Minn.2005); *State v. Blanche*, 696 N.W.2d 351, 376 (Minn.2005). Therefore, we hold that de novo review is the appropriate standard for reviewing a district court's denial of a motion for severance of offenses under Minn. R.Crim. P. 17.03.

 Minnesota Rule of Criminal Procedure 17.03, subd. 3 delineates the standards for severance of offenses. Rule 17.03, subd. 3(1)(a) provides that on motion of the prosecutor or the defendant, the district court "shall sever offenses or charges if * * * the offenses or charges are not related." The rule also provides that the district court must sever offenses if the court "determines severance is appropriate to promote a fair determination of the defendant's guilt or innocence of each offense." Minn. R.Crim. P. 17.03, subd. 3(1)(b). Therefore, when faced with a motion for severance of offenses, a district court must first decide whether the offenses are related and, if they are related, must determine whether joinder would prejudice the defendant. *Profit*, 591 N.W.2d at 459.

 Offenses are "related," and severance is not required under rule 17.03, subd. 3(1)(a), if the offenses arose out of a single behavioral incident. *See Profit*, 591 N.W.2d at 460; *Dukes*, 544 N.W.2d at 20. We have indicated that courts should evaluate the temporal and geographic proximi-

---

7. For the sake of simplicity, we will, where appropriate, refer to the shootings in apartment 304 as the "304 offenses" and the offenses arising out of Hannah's murder as the "303 offenses."

ty of the offenses and assess whether the conduct was motivated by an effort to obtain a single criminal objective in order to determine whether offenses are part of a single behavioral incident for severance purposes. *Dukes*, 544 N.W.2d at 20; *see also Profit*, 591 N.W.2d at 458, 460.

Here, Hannah's murder occurred in the apartment immediately adjacent to apartment 304 mere minutes after the shootings in 304. In addition, the explanation advanced by the state for Hannah's murder, and the one presumably adopted by the jury, was that Kendell shot Hannah to avoid apprehension for the shootings in apartment 304. Thus, the same criminal objective underlies the 303 offenses and the 304 offenses—the desire to kill Coburn and her children without detection by police. When a defendant commits a second crime to avoid apprehension for a previous crime committed close in time and location to the second crime, the offenses constitute a single behavioral incident. *See State v. Gibson*, 478 N.W.2d 496, 497 (Minn.1991); *State v. White*, 292 N.W.2d 16, 18 (Minn. 1980). We therefore conclude that the district court correctly determined that the offenses in this case were part of a single behavioral incident and, thus, were related.

■ Rule 17.03 requires severance of offenses, even related offenses, if severance is "appropriate to promote a fair determination of the defendant's guilt"—that is, if joinder would unfairly prejudice the defendant. Minn. R.Crim. P. 17.03, subd.

3(1)(b); *see Profit*, 591 N.W.2d at 459; *White*, 292 N.W.2d at 18. Joinder is not unfairly prejudicial if evidence of each offense would have been admissible at a trial of the other offenses had the offenses been tried separately. *See Profit*, 591 N.W.2d at 460–61; *State v. Conaway*, 319 N.W.2d 35, 42 (Minn.1982).

■ Here, evidence of the shootings in apartment 304 would have been admissible as "immediate episode" evidence at a separate trial for Hannah's murder, and vice versa.[8] *See State v. Townsend*, 546 N.W.2d 292, 296 (Minn.1996). We have said that "evidence relating to offenses that were part of the 'immediate episode for which defendant is being tried' may be admissible."[9] *Id.* (quoting *State v. Spreigl*, 272 Minn. 488, 497, 139 N.W.2d 167, 173 (1965)). Immediate episode evidence is a separate category from evidence of other bad acts under Minn. R. Evid. 404(b). *See Townsend*, 546 N.W.2d at 296. Immediate episode evidence is not subject to the notice requirement announced in *State v. Spreigl*. *See State v. Bolte*, 530 N.W.2d 191, 197 & n. 1 (Minn.1995); *Spreigl*, 272 Minn. at 497, 139 N.W.2d at 173; Minn. R.Crim. P. 7.02 (codifying *Spreigl's* notice requirements).

The offenses in this case were committed as part of a single course of conduct constituting a single episode. *See Townsend*, 546 N.W.2d at 296 (concluding that a shooting committed close in time to the

---

8. Evidence of the 304 offenses also would have been admissible at a separate trial for the 303 offenses under Minn. R. Evid. 404(b) to prove the identity and motive of Hannah's killer. *See* Minn. R. Evid. 404(b); *State v. Bailey*, 677 N.W.2d 380, 402 (Minn.2004); *State v. Ferguson*, 581 N.W.2d 824, 834–35 (Minn.1998).

9. The state contends that *State v. Wofford*, 262 Minn. 112, 114 N.W.2d 267 (1962), provides independent grounds for introducing evi-

dence of the 304 offenses at a trial for the 303 offenses. *Wofford* provides that evidence of a related offense may be admissible to prove the charged offense where the offenses "are linked together in point of time or circumstances so that one cannot be fully shown without proving the other." *Id.* at 118, 114 N.W.2d at 271. We interpret this statement in *Wofford* to be simply another way of phrasing the concept of "immediate episode" evidence.

shooting for which the defendant was being tried was part of the immediate episode). The shootings in the two apartments were so closely linked that "one cannot be fully shown without proving the other"; they were "part of one transaction." *State v. Wofford,* 262 Minn. 112, 118, 114 N.W.2d 267, 271–72 (1962). Furthermore, evidence of the 304 offenses is relevant to proof of the 303 offenses by establishing the identity of Hannah's killer and Kendell's motive for the murder. Evidence of the 303 offenses is relevant to proof of the 304 offenses because the evidence supports an inference of intent to kill Coburn, Yasmeen, and Patrick. *See* Minn. R. Evid. 402 (providing that evidence must be relevant to be admissible).

Evidence of the 304 offenses offered at a trial for the 303 offenses and evidence of the 303 offenses offered at a trial for the 304 offenses would have been subject to the probative value/unfair prejudice balancing test of Minn. R. Evid. 403. Minn. R. Evid. 403 ("[E]vidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice * * *."). Here, where the offenses were part of the same course of conduct, evidence of each offense would have been highly probative of the other offenses. Given the close connection between the offenses, the probative value of the evidence of each offense would not have been substantially outweighed by the risk of unfair prejudice at a trial for the other offenses.

▮ The mere fact that evidence of the 304 offenses might have been harmful to Kendell's case at a trial for the 303 offenses, or vice versa, would not have sufficed to require exclusion because "evidence is unfairly prejudicial, and thus excludable, only if used 'to persuade by illegitimate means.' " *Profit,* 591 N.W.2d at 461 (quoting *Townsend,* 546 N.W.2d at 296). Evidence of the 303 offenses offered at a trial for the 304 offenses and evidence of the 304 offenses offered at a trial for the 303 offenses would not have persuaded by "illegitimate means" nor led a jury to reach a verdict on an improper basis. Such evidence would not have been so distracting, complex, or inflammatory as to have confused a jury about the state's burden of proof at each trial. Because evidence of each offense would have been admissible at a separate trial for the other offenses, joinder of the offenses did not unfairly prejudice Kendell, and severance was not required to promote a fair determination of Kendell's guilt.[10] *See* Minn. R.Crim. P. 17.03, subd. 3. Accordingly, we hold that the district court did not err in denying Kendell's motion for severance.

### III.

▮ Kendell next argues that the district court lacked authority to submit a

---

**10.** Related to his argument on severance, Kendell claims that the district court erred by failing to give the jury instruction required by *State v. Kates,* 610 N.W.2d 629, 631 (Minn. 2000). In *Kates,* we announced a new rule requiring district courts to instruct juries to consider separately each of multiple charged offenses. *Id.* Kendell correctly notes that the district court in this case did not give the instruction required by *Kates.* Because Kendell did not object at trial to the absence of the *Kates* instruction, we review his claim only for plain error affecting substantial rights. *See State v. Griller,* 583 N.W.2d 736, 740 (Minn.1998). While it was plainly erroneous for the court to fail to give the instruction expressly required by *Kates,* the absence of the instruction did not have a significant impact on the verdict because the court instructed the jury separately on the elements of each of the 12 charged offenses. These instructions likely performed the same function that a *Kates* instruction would have performed. Further, the fact that the verdicts returned on the different offenses were separated in time reveals that the jury considered each offense individually.

special interrogatory to the jury asking whether Kendell was a danger to public safety. Kendell contends that because Minn.Stat. § 609.1095, prior to its amendment in 2005, provided that "the court" must find that a defendant is a danger to public safety in order to impose an upward sentencing departure, a court may not permit a jury to make that finding. Whether a district court has authority to implement a particular court procedure is a question of law, which we review de novo. *See State v. Pflepsen,* 590 N.W.2d 759, 763 (Minn.1999).

Resolution of this issue is controlled by our recent decision in *State v. Chauvin,* 723 N.W.2d 20, 2006 WL 3026126 (Minn. 2006). In *Chauvin,* we held that a district court had inherent judicial authority to respond to *Blakely* by impaneling a jury to make factual findings on aggravating sentencing factors when the legislature had not yet amended the unconstitutional judicial-fact-finding portions of the Minnesota Sentencing Guidelines in response to *Blakely.*[11] 723 N.W.2d 20, 2006 WL 3026126, at *1, *9. The procedures implemented by the district court at Kendell's trial are not distinguishable in any relevant way from the procedures we approved in *Chauvin.*[12] *See Id.,* 723 N.W.2d 20, 2006 WL 3026126, at *1–3. As in *Chauvin,* at the time of Kendell's trial, the legislature had not yet amended the dangerous offender statute, Minn.Stat. § 609.1095, to remedy its constitutional deficiencies in light of *Blakely. See Id.,* 723 N.W.2d 20, 2006 WL 3026126, at *6. Moreover, as in *Chauvin,* the special interrogatory used at Kendell's trial was necessary to achieve a unique judicial function and did not infringe on the legislature's function of setting the limits on penalties for criminal offenses. *Id.,* 723 N.W.2d 20, 2006 WL 3026126, at *5–6; *see State v. Shattuck,* 704 N.W.2d 131, 148 (Minn.2005) (noting that the "power to fix the limits of punishment for criminal acts lies with the legislature"). On the contrary, the special interrogatory procedure effectuated the legislative policy expressed in section 609.1095, subdivision 2, of permitting upward sentencing departures for defendants who pose a special danger to public safety. *See* Minn.Stat. § 609.1095, subd. 2. Consequently, we hold that the district court had inherent judicial authority to submit to the jury the special interrogatory regarding a factor used to enhance Kendell's sentence.

### IV.

 Kendell also argues the state denied him due process of law by failing to include in the indictment the grounds used to enhance his sentence. In addition, Kendell contends that even if the departure grounds need not have been charged in the

---

11. The sentence enhancement in this case involves the dangerous offender statute, not the Sentencing Guidelines. As with the Sentencing Guidelines, however, the judicial fact finding authorized by the dangerous offender statute—section 609.1095, subdivision 2—prior to its amendment in 2005 was found unconstitutional in light of *Blakely* by the Minnesota Court of Appeals. *State v. Fairbanks,* 688 N.W.2d 333, 336–37 (Minn.App.2004), *rev. granted* (Minn. Jan. 20, 2005), *rev. denied* (Minn. Dec. 13, 2005).

12. The special interrogatory procedures at Kendell's trial differed slightly from those at Chauvin's trial in that the state presented additional evidence—evidence of Kendell's prior convictions—at the second phase of Kendell's trial, whereas no new evidence was presented at the sentencing phase of Chauvin's trial. *Chauvin,* 723 N.W.2d 20, 2006 WL 3026126, at *3. But the absence of new evidence in the second phase of Chauvin's trial was not critical to our decision in that case that the district court had inherent judicial authority to submit a special interrogatory to the jury regarding an aggravating sentencing factor.

indictment, the state violated his due process rights by failing to provide him with adequate notice of its intent to seek an upward durational departure under section 609.1095. We review questions of constitutional interpretation de novo. *Shattuck,* 704 N.W.2d at 135.

■■■ The Sixth Amendment, applicable to the states through the Fourteenth Amendment Due Process Clause, demands that a defendant "be informed of the nature and cause of the accusation." U.S. Const. amends. VI, XIV; *Faretta v. California,* 422 U.S. 806, 818, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). This "nature and cause" requirement is satisfied if an indictment "contains such descriptions of the offense charged as will enable [a defendant] to make his defense and to plead the judgment in bar of any further prosecution for the same crime." *State v. Becker,* 351 N.W.2d 923, 926 (Minn.1984) (quoting *Rosen v. United States,* 161 U.S. 29, 34, 16 S.Ct. 434, 40 L.Ed. 606 (1896)). In applying this requirement, we have said that an indictment in Minnesota must contain all of the elements or "essential facts" necessary to constitute the offense charged. *State v. Serstock,* 402 N.W.2d 514, 518 (Minn.1987); *State v. Oman,* 265 Minn. 277, 281, 121 N.W.2d 616, 619–20 (1963). However, we have held that an indictment need not specify the sentencing statute that will govern a defendant's sentence in order to satisfy due process. *McCollum v. State,* 640 N.W.2d 610, 617–19 (Minn.2002).

In *Apprendi v. New Jersey,* the United States Supreme Court stated that a fact used to enhance a sentence beyond the statutory maximum is the "functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict." 530 U.S. 466, 494 n. 19, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); *see also Ring v. Arizona,* 536 U.S. 584, 609, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Because enhancement factors operate as elements, the Court concluded that, like elements, they must be submitted to a jury and proven beyond a reasonable doubt. *Apprendi,* 530 U.S. at 490, 120 S.Ct. 2348.

■■■ Kendell argues that the Supreme Court's equation of aggravating sentencing factors with elements of an offense mandates that such factors must be included in the indictment. *See Jones v. United States,* 526 U.S. 227, 232, 243 n. 6, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999). But the Court's conclusion that sentencing factors operate as the "functional equivalent" of elements for purposes of the Sixth Amendment jury trial right does not dictate that such factors are elements for purposes of a Minnesota indictment. *See McKaney v. Foreman,* 209 Ariz. 268, 100 P.3d 18, 22 (2004). The right to a jury trial serves a different purpose than the "nature and cause" requirement and the due process notice requirement; the former addresses the adequacy of proof of the offense charged and of the aggravating sentencing factors, while the latter simply provides a defendant notice of the charges. *Id.* We therefore conclude that aggravating sentencing factors need not be charged in an indictment in Minnesota. This conclusion is in line with the vast majority of states that have considered this issue.[13] *See Evans v. State,* 389 Md.

13. Language in cases in the *Apprendi* line suggests that in federal prosecutions aggravating sentencing factors must be charged in an indictment. *See, e.g., United States v. Cotton,* 535 U.S. 625, 627, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002); *Jones,* 526 U.S. at 243 n. 6, 119 S.Ct. 1215. But the Supreme Court has never held that the United States Constitution requires that aggravating sentencing factors must be charged in a state court indictment. On the contrary, in both *Apprendi* and *Ring,* the Court specifically declined to address "the indictment question." *Ring,* 536 U.S. at 597 n. 4, 122 S.Ct. 2428; *Apprendi,* 530 U.S. at

456, 886 A.2d 562, 573–74 (2005); *State v. Hunt*, 357 N.C. 257, 582 S.E.2d 593, 604 (2003). Accordingly, we hold that Kendell was not denied due process by the state's failure to include in the indictment the factor used to enhance his sentence.

In *Chauvin*, we recently determined that due process and the Sixth Amendment "nature and cause" requirement do not demand that aggravating sentencing factors be charged in a criminal complaint. 723 N.W.2d 20, 2006 WL 3026126, at *10. We concluded that due process and the Sixth Amendment "nature and cause" requirement are satisfied when a defendant is notified of the maximum potential sentence for the crime charged and receives adequate pretrial notice of the state's intent to seek an upward sentencing departure. *Id.*

Here, the indictment informed Kendell that the maximum potential sentence for attempted first-degree murder is 20 years. Contrary to Kendell's assertion, the state notified Kendell one week before trial of its intent to seek an upward departure based on the dangerous offender statute.[14] As in *Chauvin*, this pretrial notice satisfied due process and the Sixth Amendment "nature and cause" requirement by providing Kendell with sufficient notice of the proposed departure grounds to enable him to present a defense. Indeed, Kendell advances no argument as to how the claimed deficiencies in the state's notice impeded his defense. Thus, we hold that Kendell received sufficient notice of the state's intent to seek an upward departure under the dangerous-offender statute to satisfy due process.

## V.

We now address the two arguments Kendell advances in his pro se supplemental brief. First, Kendell contends that it was improper for the district court to permit two witnesses to testify that, soon after Kendell got into Bates's car following the shootings, they heard Kendell say, "I'm going to hell." We review a district court's evidentiary rulings for abuse of discretion. *State v. Morton*, 701 N.W.2d 225, 234 (Minn.2005).

The testimony regarding Kendell's statement was properly admitted because the statement was an admission by a party opponent. Minnesota Rule of Evidence 801(d)(2) provides that a statement made by a party and offered against that party is an admissible party admission, not hearsay. Here, Kendell's own statement was offered against him and therefore is not hearsay. In addition, contrary to Kendell's assertion, this statement is not improper character evidence because it does not tend to prove a propensity to engage in certain conduct. *See* Minn. R. Evid. 404. Kendell's statement is relevant because it assisted the jury in understanding his state of mind immediately after the shootings. Further, the statement's probative value is not outweighed by the risk of unfair prejudice. *See* Minn. R. Evid. 403. The statement is not unfairly prejudicial because it does not "persuade by illegitimate means." *Townsend*, 546 N.W.2d at 296. Consequently, we hold that the district court did not abuse its discretion by allowing witnesses to testify

477 n. 3, 120 S.Ct. 2348. Furthermore, in *Apprendi* the Court noted that the Fifth Amendment indictment requirement has not been construed to apply to state prosecutions. *Apprendi*, 530 U.S. at 477 n. 3, 120 S.Ct. 2348.

14. In addition, approximately five weeks before trial, the state informed defense counsel that it would seek an upward departure in Kendell's case, though it did not mention the dangerous offender statute at that time.

that they heard Kendell say, "I'm going to hell."

Kendell's second claim in his pro se brief is that the district court erred in permitting a recording of Coburn's 911 calls to be played during the state's closing argument. During the state's case in chief, the recording was admitted into evidence and was played for the jury, and Kendell does not challenge its admissibility. Instead, he argues that it was improper for the district court to permit the jury to hear the recording a second time during closing arguments. We review the district court's decision to permit the replaying of the recording for abuse of discretion. *See Morton*, 701 N.W.2d at 234.

While it is possible that excessive replaying of the 911 recording could have unduly inflamed the jury, we have indicated that it is not error to permit a jury to replay a taped interview of a victim which was properly admitted into evidence. *See State v. Kraushaar*, 470 N.W.2d 509, 515–16 (Minn.1991). Furthermore, in closing, a prosecutor may read from the transcribed testimony of a witness and may refer to admitted evidence. *See State v. Robinson*, 539 N.W.2d 231, 240 (Minn. 1995); *State v. Waters*, 276 N.W.2d 34, 36 (Minn.1979). Here, simply allowing the state to play the recording one additional time was not unduly cumulative or unfairly prejudicial and was well within the broad discretion of the district court. Therefore, we hold that the district court did not abuse its discretion by permitting the 911 recording to be played during closing argument. Further, any error in permitting the recording to be replayed was harmless, as the jury merely heard again what it had already heard once, and ample testimony by Coburn, Yasmeen, and police officers

corroborated the content of the recording. *Cf. Kraushaar*, 470 N.W.2d at 516.

Affirmed.

GILDEA, J., took no part in the consideration or decision of this case.