*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-1449**

State of Minnesota,
Respondent,

vs.

Emmanuel Maurice Galloway,
Appellant.

**Filed August 11, 2014
Affirmed
Huspeni, Judge**[*]

Hennepin County District Court
File No. 27-CR-12-33348

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Kelly O'Neill Moller, Assistant County
Attorney, Minneapolis, Minnesota  (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Michael W. Kunkel, Assistant
Public Defender, St. Paul, Minnesota  (for appellant)

        Considered and decided by Peterson, Presiding Judge; Schellhas, Judge; and

Huspeni, Judge.

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to
Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**HUSPENI**, Judge

Appellant challenges his conviction of two counts of second-degree criminal sexual conduct, arguing (1) the district court erred in failing to sever the charges pertaining to two separate victims when the alleged offenses against them were not part of a single behavioral incident and their joinder was prejudicial to the defense; (2) the district court committed plain error when it failed to instruct the jury that it must consider each of the joined counts, and the evidence pertaining to them, separately; (3) he was denied his right to equal protection of the law when the state was permitted to exercise a peremptory challenge to exclude a prospective juror without providing an adequate race-neutral reason for doing so; and (4) the district court erred by providing the jury with a supplemental instruction on deliberation that coerced the jurors to reach a verdict and suggested that a deadlock was not a possible result.  We affirm.

## FACTS

In the summer of 2012, appellant Emmanuel Maurice Galloway moved in with his new girlfriend, D.P., and her three daughters T.P., J.R., and K.P.  In August, the youngest daughter, six-year-old K.P., told T.P. that she did not like appellant because "he always touched their thighs and their butts."  T.P. brought 12-year-old J.R. into the room and asked her about appellant.  J.R. indicated that appellant had also touched her inappropriately and later told her mother that appellant "tried to stick his tongue in [her] mouth."

The next day, D.P contacted the police, who told her to contact child protection and schedule an interview for K.P. and J.R. at CornerHouse.[1] On September 25, 2012, K.P. and J.R. had their interviews at CornerHouse. Both girls reported that appellant had inappropriate sexual contact with them. Based on those events, appellant was charged with four counts of second-degree criminal sexual conduct in violation of Minn. Stat. § 609.343, subds. 1(a), (h)(iii). Counts one and two pertain to K.P. and counts three and four pertain to J.R.

At appellant's jury trial, J.R. testified that appellant touched her breasts, "private parts," and "butt," and that he "humped" her from behind, tried to put his tongue in her mouth, and made her touch his "private part." She stated that this happened more than once. K.P. also testified at trial, but was more reserved. She nodded when asked if anyone had touched her in places where she did not like to be touched, but when asked if she saw the person who touched her in the courtroom, she said, "No."

Appellant was found guilty of counts three and four and acquitted of counts one and two. The district court imposed a top-of-the-box guidelines sentence of 234 months in prison. This appeal follows.

**D E C I S I O N**

**I.**

Appellant argues that "the district court erred in failing to sever the charges pertaining to two separate victims where the alleged offenses against them were not part

---

[1] CornerHouse conducts forensic interviews of alleged victims of abuse.

3

of a single behavioral incident and their joinder was prejudicial to the defense." We disagree.

We review the district court's denial of a motion to sever for abuse of discretion. *State v. Jackson*, 770 N.W.2d 470, 485 (Minn. 2009). The district court must sever offenses or charges if "the offenses or charges are not related." Minn. R. Crim. P. 17.03, subd. 3(1)(a). Charges are related if they form part of a "single behavioral incident or course of conduct." *State v. Profit*, 591 N.W.2d 451, 458 (Minn. 1999). The specific facts and circumstances of each case determine whether offenses arose from a single behavioral incident. *State v. Jackson*, 615 N.W.2d 391, 394 (Minn. App. 2000), *review denied* (Minn. Oct. 17, 2000). To make this determination, we consider: (1) the time of the offenses; (2) the geographic location and proximity of the offenses; and (3) whether the conduct was motivated by a single criminal objective. *Profit*, 591 N.W.2d at 460. When offenses are improperly joined, the question becomes one of prejudice. *Id.*

### A. Single Behavioral Incident

The charges in this case involve two separate victims. The district court denied appellant's motion to sever the charges pertaining to K.P. from the charges pertaining to J.R. stating:

> This Court finds that the offenses in this case are sufficiently related to require the Court to move to the question of prejudice. The parties did not dispute that the time and geographic proximity factors weigh in favor of joinder. . . .[2] The Court finds . . . that the State's argument as to the single criminal objective in this case is compelling. The State

[2] This finding appears to be disputed. In his memorandum in support of his motion to sever the charges, appellant argued that "the charges do not cover the same time span."

4

> alleges that Defendant misused his position as a caretaker for his girlfriend's daughters in order to take sexual advantage of them. The two victims are sisters who shared the same household with Defendant, and who were periodically placed in Defendant's care during the time period in question.

Appellant concedes that the offenses share the same geographic location. Therefore, this factor supports joinder.

Appellant argues that because the offenses are not unified in time, the district court erred by denying his motion to sever. Here, the charges are based on several acts of abuse committed between June 1, 2012 and September 1, 2012. During this time period, appellant was living with the victims and their mother. Although the victims cannot give a specific time and date of the incidents of abuse, J.R. testified that she was abused more than once, and K.R. stated that appellant "always" touched the girls "butts". The abuse occurred during a continuous pattern over a discrete time period; the short time period that appellant lived with the victims. Consequently, we conclude that this factor supports joinder.

Appellant also argues that "there is no indication that the separate allegations of abuse against K.P. and J.R. were motivated by a 'single criminal objective.'" The district court determined that appellant used his position as K.P. and J.R.'s caretaker to take sexual advantage of them. We have previously held that "motivation by perverse sexual desires is too broad to constitute a single criminal objective." *State v. Suhon,* 742 N.W.2d 16, 24 (Minn. App. 2007). But, here, appellant used his authoritative role as the children's caretaker to take sexual advantage of them. The alleged abuse occurred when girls were left in appellant's care, usually while they were alone with appellant in their

5

bedroom watching television. Both girls disclosed a similar pattern of abuse; appellant touched their "butts" and vaginal areas over their clothing on more than one occasion. We therefore conclude that based on the similarity of the offenses and appellant's course of conduct, the district court did not err by denying appellant's motion to sever the charges for trial.

### B. Prejudice

Even if we were to determine for the sake of full analysis that the district court erred by denying appellant's motion to sever, we conclude that appellant was not prejudiced by that denial. *See Profit*, 591 N.W.2d at 460 ("[E]ven though joinder was improper, remand is not required if the district court's denial of the motion to sever was not prejudicially erroneous."). "Joinder is not unfairly prejudicial if evidence of each offense would have been admissible at a trial of the other offenses had the offenses been tried separately." *State v. Kendell*, 723 N.W.2d 597, 608 (Minn. 2006). If the evidence of each offense would have been admissible as *Spreigl* evidence in the trial of the other, there is no prejudice. *State v. Conaway*, 319 N.W.2d 35, 42 (Minn. 1982). *Spreigl* evidence is admissible if: (1) clear and convincing evidence shows the defendant participated in the offense; (2) the evidence is relevant to the state's case; and (3) the probative value of this evidence is not outweighed by its potential for unfair prejudice. *State v. Robinson*, 604 N.W.2d 355, 363 (Minn. 2000).

#### 1. Clear and convincing evidence

Appellant argues that because appellant was acquitted of the charges pertaining to K.P., "it is far from certain that the evidence of the allegations made by K.P. would have

been demonstrated to this degree of probability in a separate trial on the charges relating to J.R." We disagree. The Minnesota Supreme Court has rejected this argument. *See State v. Ross*, 732 N.W.2d 274, 281-82 (Minn. 2007) (reversing the court of appeals conclusion that because the appellant was acquitted by one of the joined offenses, evidence of that offense would not have been admissible as *Spreigl* evidence in separate trials of the other offenses). In *Ross*, the supreme court concluded that the appellant was not prejudiced by the improper joinder of several offenses even though he had been acquitted of one of the several charges against him. *Id.* at 282. The supreme court stated "a jury's determination that a defendant is not guilty of a particular crime does not preclude a subsequent determination that, at the time of the trial, the defendant's participation in underlying conduct related to the acquitted offense was supported by clear and convincing evidence." *Id.*

K.P. was the child who initially disclosed the abuse. During her CornerHouse interview, she stated that appellant "keep messing with us." Using anatomical drawings, K.P. indicated that appellant touched her vaginal area with his hand and stated that appellant "touched [her] butt too." She demonstrated what happened with anatomically correct dolls. Moreover, at trial, K.P. testified that she told the truth during her CornerHouse interview and that she received touches that she did not like. Even though the jury did not convict appellant of the charges pertaining to K.P., we conclude that there is clear and convincing evidence that appellant had sexual contact with her.

### 2. *Relevancy and probative value*

Appellant argues that "[e]vidence of prior acts of abuse against one alleged victim would also not have been admissible as *Spreigl* evidence in a separate trial regarding the other because it is not legitimately relevant to any disputed issue in either of the cases." To determine the relevance and materiality of an offense to the state's case, the district court considers "whether there is a sufficiently close relationship between the charged offense and the *Spreigl* offense in time, place or modus operandi." *Jackson*, 615 N.W.2d at 395.

Here, the offenses occurred in the same three-month time period and in the same geographic location. The offenses against both K.P. and J.R. were alleged to have occurred in D.P.'s house between June and August 2012. Similarly, the offenses are connected in terms of modus operandi. Both girls stated that the abuse occurred while they were watching television in the bedroom that they shared. The alleged abuse occurred when the girls were left in appellant's care while their mother was at work, and generally occurred when one victim was alone with appellant. Both girls explained that appellant committed similar acts of abuse against them. And, the girls appeared to be aware that appellant was abusing both of them. Consequently, we conclude that there is a sufficiently close relationship between the offenses in time, place or modus operandi. *Id.*; *see also Ross*, 732 N.W.2d at 282 (concluding that although two offenses were not related for joinder purposes, they were probative for *Spreigl* purposes).

### 3. Unfair prejudice

The third factor we must consider in the *Spreigl* analysis is whether the admitted evidence was unfairly prejudicial. Appellant was acquitted of the offenses relating to K.P. In *Ross*, the supreme court stated that although the joinder in that case was improper, "Ross was ultimately acquitted of [one of the offenses], indicating that the jury weighed each charge separately and that the admission of evidence relating to each of the theft-by-swindle offenses did not result in prejudice to Ross." *Id.* at 283 n.7. Here, because the jury acquitted appellant of two of the four charges, we conclude that the admission of evidence relating to each offense did not prejudice appellant.

**II.**

Appellant argues that "[t]he district court committed plain error when it failed to instruct the jury that it must consider each of the joined counts—and the evidence pertaining to them—separately." Again, we disagree. Because appellant did not object to the jury instructions at trial, the instruction is reviewed under the plain error standard. "Under this standard, we may review an unobjected-to error only if there is (1) error; (2) that is plain; and (3) that affects substantial rights." *State v. Vance*, 734 N.W.2d 650, 655-56 (Minn. 2007), *overruled on other grounds by State v. Fleck*, 810 N.W.2d 303 (Minn. 2012). If these prongs are met, "we then decide whether we must address the error to ensure fairness and the integrity of the judicial proceedings." *State v. Milton*, 821 N.W.2d 789, 805 (Minn. 2012) (quotation omitted).

"When a defendant's conduct constitutes more than one offense, each such offense may be charged in the same indictment or complaint in a separate count." Minn. R.

9

Crim. P. 17.03, subd. 1. "[F]or trial of all offenses joined under Minn. R. Crim. P. 17.02, subd. 1, the jury *must* be instructed to consider each of the charges separately. *State v. Kates*, 610 N.W.2d 629, 631 (Minn. 2000) (emphasis added).[3]

We conclude that the district court plainly erred by not providing the requisite *Kates* instruction. *See State v. Kendell*, 723 N.W.2d 597, 609 n.10 (Minn. 2006) ("[I]t was plainly erroneous for the court to fail to give the instruction expressly required by *Kates*."). Thus, the issue here is whether that error affected appellant's substantial rights.

Appellant was acquitted of the charges related to K.P. As noted earlier, the jury demonstrated that it clearly understood that the charges should be considered separately by acquitting the defendant of one charge. *See State v. Dick*, 638 N.W.2d 486, 491 (Minn. App. 2002), *review denied* (Apr. 16, 2002). In *Dick*, we concluded that because the jury acquitted the defendant of one charge, the failure to give the *Kates* instruction was harmless. *Id.* Here, the jury's act of acquitting appellant of the charges pertaining to K.P. indicates that it understood that the charges should be considered separately. Moreover, the district court instructed the jury on the elements of each offense separately, and the jury received eight verdict forms, a guilty and non-guilty form for each offense. Because the district court's instructions indicate that the jury was to consider each count

---

[3] This rule is set forth in CRIMJIG 3.23,

> In this case, the defendant has been charged with multiple offenses. You should consider each offense and the evidence pertaining to it, separately. The fact that you may find defendant guilty or not guilty as to one of the charged offenses should not control your verdict as to any other offense.

10 *Minnesota Practice*, CRIMJIG 3.23 (2013).

separately, we conclude that the error of failing to give the *Kates* instruction did not substantially affect the verdict. *See Kendell*, 723 N.W.2d at 609 n.10 ("[T]he court instructed the jury separately on the elements of each of the 12 charged offenses. These instructions likely performed the same function that a *Kates* instruction would have performed.").

**III.**

Appellant next argues that the district court erred during jury selection, when it overruled his *Batson* challenge to the state's peremptory challenge to prospective juror six, a Somali woman. We disagree. "Generally, each party has a limited number of peremptory challenges in a jury trial." *State v. Diggins*, 836 N.W.2d 349, 354 (Minn. 2013). "Unlike a challenge for cause, a peremptory challenge allows a party to strike a prospective juror without having to explain the reason for the strike." *Id.* But "[t]he use of peremptory challenges to exclude potential jurors is subject to the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution." *State v. Pendelton*, 725 N.W.2d 717, 723 (Minn. 2007) (citing *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S. Ct. 1712 (1986)).

"The three-step *Batson* analysis determines whether the exercise of a peremptory challenge was motivated by racial discrimination." *Diggins*, 836 N.W.2d at 354. "First, the defendant must make a prima facie showing that the [s]tate exercised its peremptory challenge against a prospective juror on the basis of race." *Id.* (quotation omitted) "To make such a showing, the defendant must establish that one or more members of a racial

11

group have been peremptorily excluded from a jury and that the circumstances of the case raise an inference that the exclusion was based on race." *Id.* (quotations omitted).

"Second, once the defendant makes a prima facie showing, the burden shifts to the [s]tate to articulate a race-neutral explanation for exercising the peremptory challenge." *Id.* at 354-55 (quotation omitted). "The explanation need not be persuasive, or even plausible." *Id.* at 355 (quotation omitted). "Unless a discriminatory intent [is] inherent in the prosecutor's explanation, the reason offered is deemed race neutral." *Id.* (quotation omitted).

"Third, if the [s]tate articulates a race-neutral explanation, the district court must determine whether the defendant has carried his burden of proving purposeful discrimination." *Id.* (quotation omitted). "Specifically, the court must determine whether the defendant has shown that the peremptory challenge was motivated by racial discrimination and that the [s]tate's proffered explanation was merely a pretext for the discriminatory motive." *Id.* (quotations omitted). "The defendant ultimately carries the burden of persuasion to demonstrate the existence of purposeful discrimination; this burden never shifts from the opponent of the peremptory challenge." *Id.* We give great deference to the district court's *Batson* ruling and will uphold it unless clearly erroneous. *Id.*

When appellant challenged the state's peremptory strike of prospective juror six, the district court concluded that he had not made a prima facie case and stated:

> The Court is going to deny the Batson challenge in this case on two grounds. First of all, I think the prima faci[e] case is iffier in this instance because now we're not talking

> about the sole Black male on the jury, we're talking about one of four persons of color on the jury, and one of the three women of color on the jury; and the State has not struck either of the other two women of color.

In his brief, appellant appears to suggest that he made a prima facie showing of racial discrimination because he had successfully made a *Batson* challenge to the state's strike of juror seven, an African-American man, immediately prior to the state's attempt to strike juror six. But "the use of a peremptory challenge to remove a member of a racial minority does not necessarily establish a prima facie case of discrimination." *State v. Reiners*, 664 N.W.2d 826, 831 (Minn. 2003). At the time juror six was struck, the state had struck two Caucasian men; two Native American women and one African-American man remained on the panel. The prima facie showing analysis also focuses on the racial overtones of the case, specifically, "[w]hether the circumstances of the case raise an inference of discrimination depends in part on the races of the defendant and the victim." *Angus v. State*, 695 N.W.2d 109, 117 (Minn. 2005) (holding that there were "no racial overtones" for *Batson* purposes where the defendant and victim were both white). Here, appellant and the victims are all African-American, and therefore, the case did not present overt racial overtones. Thus, we conclude that the district court's finding on the first prong of the *Batson* test was not clearly erroneous.

The second step of the *Batson* test requires the state to articulate race-neutral reasons for exercising the challenged peremptory strikes. The state informed the district court that it struck juror six because

> [juror six] said "I tend not to believe what cops say." . . . She also . . . discussed her Muslim faith and the tenets of her religion in that she is not to sit in judgment of others. . . .
>
> Additionally . . . [she] indicated that she wasn't sure if she was going to understand fully the proceedings and indicated . . . that there may be some difficulty in understanding, comprehending the spoken word in English.

Appellant concedes that the state presented a race-neutral reason for striking juror six.

Appellant argues, however, that "though the reasons provided by the state for striking [juror six] were facially race-neutral, [appellant] established that they were nonetheless pretextual." We disagree. The district court concluded that the state's race neutral reason had not been rebutted, relying in part on the juror's

> religious qualms about how she's going to reconcile sitting in judgment in this case with what her religion tells us, that she's not supposed to be sitting in judgment of someone. I do think that is a legitimate race neutral reason that the State has articulated that has not been rebutted as pre-textual by the defense.

While appellant argues that the state's concerns about juror six were "not borne out by the record of her private questioning by the court and the parties." we agree with the district court and conclude that he fails to carry his ultimate burden of proving that the state's peremptory challenge was motivated by racial discrimination. *See State v. Gaitan*, 536 N.W.2d 11, 15-16 (Minn. 1995) (upholding the district court's finding that the state's peremptory strike of a juror based on the juror's reluctance to sit in judgment was not a pretext for racial discrimination).

The state further explained that it used a peremptory strike to remove juror six because she expressed concerns about understanding the proceedings. When asked if she would be able to listen to testimony, juror six responded,

> I'm not sure. I think if I understand the case correctly and—I don't know if you guys repeat stuff or not. But if I understand it, it might be easier for me to come to a conclusion. But if there is something that I missed or something—I really can't make that decision right now, but I think it's a day-to-day basis kind of thing.

Appellant argues that juror six spoke English quite well and has been in the United States since she was five-years-old. But, by indicating that her English comprehension was a "day-by-day basis kind of thing," juror six expressed reservations about her own ability. *See State v. Wren*, 738 N.W.2d 378, 388-89 (Minn. 2007) (upholding the district court's rejection of a *Batson* challenge involving a juror who did not understand English).

The state also argued that juror six had already formed opinions about the case when she stated

> I feel sorry for this guy, . . . he's African American . . . I feel like there has been a bias towards that, and I got this by personal experiences and other experiences that I do feel like if you're in the system as an African American, then it's going to be harder.

We conclude that the state's peremptory strike on this basis was not pretextual. *See State v. Greenleaf*, 591 N.W.2d 488, 501 (Minn. 1999) (upholding a peremptory strike of a juror based on the juror's sympathy toward the defendant).

Appellant next argues that the state used juror six's negative experience with law enforcement as a pretext for striking her because she stated that she would be able to set

15

aside her own experiences and evaluate an officer's testimony. On her jury questionnaire she stated, "I had some contacts with police that have taught me to be awar[e] of police and I do try to . . . stay [a]way." She also stated that based on her negative experiences with law enforcement, she tends not to believe what they say. We conclude that the state's peremptory challenge of juror six based on her opinions about law enforcement and her bias toward appellant was not pretextual. *See Wren*, 738 N.W.2d at 388 (upholding a peremptory strike of a juror based on his ability to judge officer testimony). Overall, we conclude that the district court did not clearly err by denying appellant's *Batson* challenge.

**IV.**

Appellant argues that "the district court erred in providing the jury with a supplemental instruction on deliberation that coerced the jurors to reach a verdict and suggested that a deadlock was not a possible result." We disagree. We review a district court's charge to a jury to continue deliberating after the jury has indicated it is deadlocked for abuse of discretion. *State v. Cox*, 820 N.W.2d 540, 550 (Minn. 2012). The district court may require the jury to continue deliberating and may give or repeat an instruction if it believes that the jury has been unable to agree. *State v. Kelley*, 517 N.W.2d 905, 909 (Minn. App. 1994). "As long as the district court does not coerce a verdict, the court may require the jury to continue deliberating." *Cox*, 820 N.W.2d at 550. A district court can neither inform that the case must be decided nor allow the jury to believe that a deadlock is not an option. *State v. Jones*, 556 N.W.2d 903, 911-12 (Minn. 1996).

The district court provided the jury with its final instructions in part as follows:

> In order for you to return a verdict on each charge, whether guilty or not guilty, each juror must agree with that verdict. Your verdict must be unanimous.
>
> You should discuss the case with one another, and deliberate with a view toward reaching agreement, if you can do so without violating your individual judgment. You should decide the case for yourself, but only after you have discussed the case with your fellow jurors and have carefully considered their views. You should not hesitate to reexamine your views and change your opinion if you become convinced they are erroneous, but you should not surrender your honest opinion simply because other jurors disagree or merely to reach a verdict.

*See* 10 *Minnesota Practice*, CRIMJIG 3.04 (2013). The next day, the jury asked, "in the event the jurors do not agree unanimously, what options do we have in closing or continuing deliberations?" At this point, the jury had only been deliberating for less than one full day and both parties agreed that the jury should be instructed to continue deliberating. The court brought the jury in and re-read the second paragraph of CRIMJIG 3.04—the district court did not re-read the portion about jury unanimity.

Later that afternoon, the jury submitted the following question, "after careful deliberations and reevaluations, if a unanimous decision/verdict is not agreed upon, are we to enter a not guilty verdict?" Defense objected to the reading of anything other than the deliberation instruction already provided and noted that the jury may be deadlocked. The district court stated that the note did not indicate that the jury was deadlocked and responded to the jury's question in relevant part as follows:

> A verdict must be unanimous, whether it is a guilty verdict or a not guilty verdict. . . . The jury room is no place for pride

17

of opinion or for espousing and maintaining either side of a cause in the spirit of controversy. The single object that is to be effected in the jury room is to arrive at a true verdict. This can be done only by deliberation, mutual concession and a due deference to the opinions of each other, for the verdict to which a juror agrees must of course be his or her own verdict, the result of his or her own convictions and not mere acquiescence in the conclusions of a juror's fellows. Yet in order to bring 12 minds to a unanimous verdict, you should examine the questions submitted to you with candor and with a proper regard and deference to the opinions of each other. Though no juror is required to sacrifice conscientious convictions, he or she ought nevertheless to weigh carefully the opinions of his or her associates and the arguments and reasons upon which they are founded and if, upon due consideration, he or she is convinced that they are probably right, and he or she is in error, it is a juror's duty to agree with them. It is therefore you duty, ladies and gentlemen, to reach all reasonable efforts to reach an agreement. And I'm going to ask you to resume your deliberations with that instruction.

The jury returned with its verdict approximately one half-hour later.

Appellant cites *State v. Kelly* to support his argument that the instruction led the jurors to believe that they are required to reach a unanimous verdict and that deadlock is not a permissible result. 517 N.W.2d at 905. *Kelly* is distinguishable. In that case the jury indicated that it was deadlocked and asked "How long we have to carry on . . . please advise." *Id.* at 907. The district court, without consulting the attorneys, instructed the jury to "[c]ontinue deliberations." Five hours later, the jury sent another note indicating that it could not reach a verdict. *Id.* The district court again told the jury to "keep working." *Id.* at 908. The jury returned a guilty verdict two hours later. *Id.* The supreme court held that the district court's repeated instruction to continue deliberations even though the jury indicated it was deadlocked, warranted a new trial." *Id.* at 910.

18

Unlike *Kelly*, the jury in this case was not deadlocked. By asking what happens "if a unanimous decision/verdict is not agreed upon," the jury sought guidance on what they should do in the event that they become deadlocked. *See Cox*, 820 N.W.2d at 551 ("By asking, 'What happens *if* we are unable to agree on the third charge' . . . the jury appears to seek guidance not because the jury is currently deadlocked, but in the event that the jury may become deadlocked in the future."). Moreover, none of the relevant facts from *Kelly* are present in this case. The district court informed both parties that it had received a note from the jury and provided the parties with a copy of the instruction it wished to give. Unlike *Kelly*, the district court here listened to arguments by the attorneys about how it should respond to the jury's question. Thus, we conclude that the district court did not abuse its discretion in instructing the jury to continue deliberating because the jury was not deadlocked.

Furthermore, the record does not indicate that the district court coerced the jury into returning a unanimous verdict. Appellant acknowledges that "nothing in the actual language of the instruction explicitly tells the jurors that they are required to reach a unanimous verdict before they are discharged," and notes that the instruction "arguably suggests that a deadlock is technically permissible." And the additional instruction did not indicate that the jury was required to continue deliberations; in fact, it states that it is the jury's duty to "reach all reasonable efforts to reach an agreement." The instruction stated that "the verdict to which a juror agrees must of course be his or her own verdict, the result of his or her own convictions and not mere acquiescence in the conclusions of a juror's fellows." We conclude that the district court did not abuse its discretion by

19

giving the challenged instruction. *See Cox*, 820 N.W.2d at 552 ("It is unlikely that the jury would interpret that instruction to mean that it was required to reach a verdict, especially as the jury was originally instructed not to surrender individually held opinions merely to reach a verdict.").

**Affirmed.**