STATE of MINNESOTA, Respondent,

v.

Amani Jamalludin FARDAN, Appellant.

No. A08–1425.

Supreme Court of Minnesota.

Oct. 22, 2009.

Steven P. Russett, Assistant Public Defender, St. Paul, MN, for appellant.

Lori Swanson, Attorney General, St. Paul, MN, Michael O. Freeman, Hennepin County Attorney, Thomas A. Weist, Assistant County Attorney, Minneapolis, MN, for respondent.

## OPINION

GILDEA, Justice.

Following a jury trial in Hennepin County District Court, appellant Amani Jamalludin Fardan was convicted of first-

degree felony murder, second-degree felony murder, and first-degree aggravated robbery in connection with the death of Bernard Brown. Fardan was sentenced to life in prison. Fardan filed a direct appeal to this court, arguing that the district court erred by (1) admitting a statement made by Fardan in violation of his *Miranda* rights; (2) admitting *Spreigl* evidence; and (3) sentencing Fardan to a consecutive life sentence rather than a concurrent sentence. Fardan also argues that there was insufficient evidence to support his first-degree felony murder conviction. Lastly, Fardan asks that if we affirm his first-degree murder conviction, we vacate his other convictions. We affirm Fardan's first-degree felony murder conviction and modify his convictions by vacating the second-degree murder and first-degree aggravated robbery convictions involving Brown.

### A. The Crime and Investigation

Sometime after 2 a.m. on October 10, 2005, at the corner of Broadway and Emerson in Minneapolis, a passerby heard a shout for help. The passerby found Bernard Brown lying on the ground. Brown said he had been shot; the passerby ran to a nearby pay phone and called the police. When police arrived, Brown was alive but nonresponsive. He died shortly thereafter from a gunshot wound to his abdomen.

Police found that Brown had a cell phone holder clipped to his belt and an earphone piece, but no cell phone. Based on telephone calls made from Brown's phone after his death, police identified 15–year–old Fardan as a suspect, along with Micah Brewer and Randall Graves. Two brothers, Joshua and Jeremy Jackson, were also arrested in connection with the crime, as was a man named Wanblee Jourdain.[1]

The Jackson brothers both testified that they, Fardan, Brewer, and Jourdain gathered at Graves' house the evening of October 9, 2005, and discussed committing a robbery. In the early morning hours of October 10, the group drove around in three separate stolen vehicles looking for someone to rob. Jeremy drove a stolen gray Suburban and Brewer, Graves, and Fardan were passengers. Joshua followed driving a stolen white Buick. Jourdain followed in a stolen van. When they reached Emerson and Broadway, Jeremy parked the Suburban and Joshua parked behind him. Jourdain parked around the block.

Joshua testified that he saw Fardan and Brewer get out of the Suburban just as Brown was coming down the street. Joshua said that Fardan was carrying a small rifle, while Brewer had a baseball bat. Both had bandanas across their faces. Joshua said that, although he could not hear Fardan or Brewer, he heard Brown say "I ain't got nothing" as he threw a CD case to the ground and raised his arms. Fardan was standing about three to five feet away from Brown, pointing the rifle at Brown. Although Joshua was looking behind him when he heard a gunshot, he turned around to see Brown fall to the ground. Joshua saw Brewer pick up the CD case, but did not see anything else taken from Brown.

Jeremy testified that Graves got out of the car in addition to Brewer and Fardan. Jeremy heard Brown screaming "help," but did not hear a gunshot because the radio was on. But Jeremy said he saw Fardan shoot Brown, and saw Brown fall to the ground. Jeremy said he saw one of the boys take both the CD case and a cell

---

1. Evidence at trial established that Brewer and Graves were 16 years old at the time of the crimes, Joshua was 15 years old, and Jeremy was 14 years old.

phone from Brown.[2] After everyone returned to the Suburban, Jeremy and Joshua drove their respective stolen vehicles to where Jourdain had parked. Fardan, Brewer, and Graves then got in the stolen van with Jourdain. The Jacksons went home.

### B. Fardan's Arrest and Statement

Police arrested Fardan at a friend's house on the night of October 14, 2005. Plain-clothes officers handcuffed him and placed him in an unmarked police car. Fardan's father, Suluki Fardan, arrived at the friend's house and briefly spoke to Fardan after Fardan was placed in the police car. Fardan was taken to Minneapolis City Hall, where he again saw his father on his way to an interrogation room. His father waited in the hallway for a couple of hours, until officers told him he might as well go home because Fardan was not going anywhere. Fardan testified at a pretrial hearing that before going inside City Hall, he had asked the arresting officers if his father could be present. Fardan was told that "he would be."

A videotape shows that Fardan was brought into the interrogation room at a little before 1:30 a.m., where he was alone for 1 hour and 53 minutes. During that time, Fardan was sleeping or resting; he also stood up, apparently in an effort to try to stay awake. The interrogation began around 3:25 a.m., and lasted approximately 52 minutes.

Two investigators came in to question Fardan. The investigators were not aware that Fardan's father was at the station and wanted to be present at the interview. Usually arresting officers will communicate such information to the interrogating officers, but that night the investigators

and arresting officers never spoke, and no record exists of who the arresting officers were. Fardan did not request his father's presence during the interview, although he asked the interrogating officers at the very end of the interview if he could see his father "real quick." Fardan testified that he did not ask for his father during the interrogation because he had already asked for him and "was expecting [his father] to be there."

The investigators first took a DNA swab from Fardan. The officers told Fardan they were investigating events from October 10, 2005, and that they had already talked to many people about that night. One of the investigators then administered a *Miranda* warning. The investigator broke down the warning and specifically asked if Fardan understood each component. The investigators, however, did not tell Fardan that his statements could be used against him in adult court. Fardan indicated that he understood each component of the *Miranda* warning, and told the investigators they could ask him questions. The record reflects that Fardan had been read his *Miranda* rights once before, about three years before the night of the interrogation.

During the interrogation, Fardan admitted that he shot Brown, but said, "I didn't even want to." The investigator asked: "Any sense of remorse or do you just think it was an accident?" Fardan answered, "It was an accident." Fardan explained that "I was scaring him, the trigger kinda slipped." When asked what Fardan did to help Brown, Fardan said, "I prayed for him. That's all I could do."

Fardan also told the police that the gun that shot Brown was at Kyle Fairbank's house—Graves' cousin. Police contacted

---

**2.** Police found a CD case at Jeremy's home and Brown's cell phone in the stolen van Jourdain drove. A wooden bat, which is what Jeremy saw Brewer holding, was later found where Fardan was arrested.

Fairbanks, who said that he had received the gun, wrapped in a jacket, from Fardan. Fairbanks said that he unwrapped and touched the gun after receiving it. Fairbanks had put the gun in a cousin's closet, where police found it.

The recovered gun was a .22 semi-automatic rifle. There were two latent fingerprints and a palm print on the gun; all of these prints belonged to Fairbanks. The butt stock of the rifle had been sawed off or broken off and black electrical tape had been wrapped around it. Evidence showed, however, that the electrical tape had not affected the function of the rifle; the firing mechanism was within the normal range, with a trigger pull that needed the normal amount of pressure to fire. The bullet recovered from Brown's body was not conclusively linked to the gun, although the bullet was consistent with a .22 bullet.

Fardan moved before and during trial to exclude his statement to police; the court denied both motions. The court, after examining the totality of the circumstances, found Fardan had made a knowing, intelligent, and voluntary waiver of his *Miranda* rights, and admitted his statement during trial. The statement came into evidence through the video tape police made while interrogating Fardan. The video of Fardan's interrogation was played twice for the jury.

### C. Fardan's Trial and the Stipulation Evidence

On December 6, 2005, a Hennepin County grand jury indicted Fardan with one count of first-degree felony murder, Minn. Stat. § 609.185(a)(3) (2008); one count of second-degree felony murder, Minn.Stat. § 609.19, subd. 2(1) (2008); and one count of first-degree aggravated robbery, Minn. Stat. § 609.245, subd. 1 (2008), in connection with Brown's death. Fardan was also indicted with 15 other crimes committed against other victims later on the night of Brown's death. On January 26, 2006, the district court certified Fardan to be tried as an adult.

In a pretrial motion, Fardan asked to sever the three counts surrounding Brown's death from the other counts; the court granted the motion and severed the trial into two parts, with the trial for Brown's murder to be tried second. On October 3, 2007, in his first trial, a Hennepin County jury found Fardan guilty of 13 crimes and not guilty of 3 crimes. The district court convicted Fardan according to the jury's guilty verdicts and imposed a 486–month sentence, which the court of appeals upheld.[3] *State v. Fardan*, No.

3. Fardan was convicted of two counts of first-degree aggravated robbery, Minn.Stat. § 609.245, subd. 1 (2008); two counts of second-degree assault, Minn.Stat. § 609.222, subd. 1 (2008); three counts of kidnapping to facilitate the commission of a felony or flight after a crime, Minn.Stat. § 609.25, subds. 1(2), 2(2) (2008); two counts of kidnapping in order to terrorize, Minn.Stat. § 609.25, subds. 1(3), 2(2); two counts of first-degree burglary, Minn.Stat. § 609.582, subd. 1(b) (2008); and one count of first-degree criminal sexual conduct using force to accomplish sexual penetration, Minn.Stat. § 609.342, subds. 1(e)(i), 2 (2004). The judge had submitted an additional charge of false imprisonment, Minn. Stat. § 609.255, subd. 2 (2008), of which Fardan was also convicted. The court of appeals affirmed all convictions except those which were duplicative and therefore violated Minn. Stat. § 609.04 (2008). *Fardan*, 2009 WL 1851404 at *9. The court vacated Fardan's two convictions for kidnapping in order to terrorize and one of his convictions for first-degree burglary. *Id.*

The jury found Fardan not guilty on one count of kidnapping in order to terrorize, Minn.Stat. § 609.25, subds. 1(3), 2(2); one count of first-degree criminal sexual conduct with the use or threat of a dangerous weapon, Minn.Stat. § 609.342, subds. 1(d), 2; and one count of first-degree criminal sexual conduct causing fear of imminent great bodily harm, Minn.Stat. § 609.342, subds. 1(c), 2.

A08–0364, 2009 WL 1851404, at *11 (Minn. App. June 30, 2009), *review granted and stayed* (Minn. Sept. 16, 2009).

Fardan's murder trial began on May 5, 2008. The State moved to admit evidence of other offenses Fardan committed the night of Brown's murder to show intent to kill and the absence of accident. Over defense objection, the court admitted the evidence. After the court decided to admit the evidence, the court, prosecutor, and defense counsel drafted a stipulation of facts that was read to the jury. The stipulation describes the other offenses committed during the early morning hours of October 10 and after the events surrounding Brown's death.[4]

The court gave a limiting instruction both before the stipulation was read and during jury instructions. Before the stipulation was read, the court told the jury that the evidence in the stipulation was "being offered for the limited purpose of assisting you in determining whether the defendant acted with the intent to kill Bernard Brown[,]" and that the evidence "may not be used to decide intent under any other element or count or for any other purpose." The judge reminded the jury during the limiting instruction that Fardan was "not being tried for and may not be convicted of any offenses other than the charged offenses. You are not to convict the defendant on the basis of these later occurrences. To do so might result in unjust, double punishment."

The jury found Fardan guilty of all three counts related to Brown's death. The district court adjudicated Fardan guilty on the counts, and sentenced him to life imprisonment for the first-degree felony murder conviction to be served consecutively to his 486–month sentence. The district court did not impose sentences for the second-degree felony murder and first-degree aggravated robbery convictions. This direct appeal follows.

I.

We turn first to Fardan's argument that his statement to police was not admissible. The State may introduce incriminating statements made by a criminal suspect during a custodial interrogation only if it shows that the defendant knowingly, voluntarily, and intelligently waived his rights. *Miranda v. Arizona*, 384 U.S.

---

4. In summary, the stipulation described the actions as follows:

Fardan, Brewer, Graves, and Jourdain drove in a stolen van when they saw two people come out of a grocery store. They followed the couple to their apartment building, where Fardan, armed with a rifle, Graves, with a baseball bat, and Brewer surrounded the couple. They robbed the couple then locked them in the trunk of the couple's car. Jourdain and Graves then drove to an ATM and stole $200 from the couple's bank account.

Upon their return, all four perpetrators went into the couple's apartment. The couple's female friend was sleeping on the couch, and awoke to see the four men, one armed with a rifle. They told her they had shot her friends, and covered her head with a blanket and tied her hands behind her back. Brewer, Graves, and Jourdain picked up multiple items and took them from the apartment. Fardan then sexually assaulted the woman. The three came back for more items; when they had left, Fardan again sexually assaulted the woman. Fardan then joined the others outside.

The couple was still in the trunk of their car. The four men put some of the stolen items into that car, made the couple get out and remove their clothes, then forced the couple back into the trunk. One of the men fired three shots into the trunk, hitting one of the victims in the thigh and arm. The four men drove off in the original stolen van and the couple's car, eventually releasing the victims from the trunk, leaving them naked on the freeway.

The gun used during these events was the same gun as was used during Brown's robbery.

436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The validity of a juvenile's *Miranda* waiver depends on the totality of the circumstances. *State v. Jones*, 566 N.W.2d 317, 324 (Minn.1997). The factors considered in evaluating the totality of the circumstances include the juvenile's age, maturity, intelligence, education, physical deprivations, prior criminal experience, the presence or absence of parents, the length and legality of detention, the adequacy of warnings, and the nature of the interrogation. *State v. Williams*, 535 N.W.2d 277, 287 (Minn.1995). The trial court's findings of fact surrounding those factors will not be reversed unless clearly erroneous. *State v. Burrell*, 697 N.W.2d 579, 591 (Minn.2005). Legal conclusions based on those findings are reviewed de novo. *Id.*

Fardan challenges the adequacy of the warning he received and he asserts that the district court did not properly evaluate the impact of his father's absence during questioning. Finally, Fardan argues that, under an analysis of the totality of the circumstances, the district court erred in concluding that his waiver was voluntary. We examine each argument in turn.

## A. Adequacy of the Warning

■■ Fardan argues that his *Miranda* warning was not adequate because the investigators failed to tell him that his statements could be used in adult court, and that the district court erred in imputing Fardan with knowledge of potential adult prosecution. Even where police fully advise a juvenile of his *Miranda* rights and the juvenile indicates that he understands, a heightened concern exists that the juvenile actually comprehends that his statements can be used in adult court. *Burrell*, 697 N.W.2d at 591–92. We have suggested that "the best course is to specifically warn the minor that his statement can be used in adult court, particularly when the juvenile might be misled by the 'protective,

nonadversary' environment that juvenile court fosters." *Id.* at 592 (citing *State v. Loyd*, 297 Minn. 442, 449–50, 212 N.W.2d 671, 676–77 (1973)); *see Williams*, 535 N.W.2d at 286; *State v. Ouk*, 516 N.W.2d 180, 185 (Minn.1994).

■ But the failure to give such a warning does not necessarily make a juvenile's *Miranda* waiver inadequate. *See Ouk*, 516 N.W.2d at 185 (rejecting a per se exclusionary rule). The warning may still be adequate if a juvenile may be imputed with the knowledge of potential adult court prosecution. The district court found that awareness of potential adult criminal prosecution could be imputed to Fardan.

■ In order to determine imputation, we examine whether the circumstances regarding the interrogation make it clear that the process is outside the realm of the juvenile court. *Burrell*, 697 N.W.2d at 592 (concluding that knowledge could be imputed when, before the *Miranda* warning, defendant had been handcuffed and told the investigators were looking into a little girl being shot); *Jones*, 566 N.W.2d at 325 n. 10 (holding that knowledge could be imputed when a number of police cars followed defendant in a high-speed chase, the officers handcuffed him, advised him that he was a suspect in a shooting, and that they worked for the sheriff's office). The district court found the following circumstances regarding the interrogation. Police put Fardan in handcuffs and took him to the Minneapolis City Hall, which is not a juvenile court setting. The investigators presented Fardan with a search warrant and took a DNA swab. The investigators told Fardan that they were investigating incidents from the early morning hours of October 10, which was the night of Brown's death. The investigators did not imply that the interrogation would be confidential or nonadversarial. Finally, while Fardan testified at a pretrial

hearing that he was not aware of the possibility of criminal prosecution, the district court rejected this testimony. *See Jones,* 566 N.W.2d at 325 (noting that appellate courts defer to the district court's ability to assess witness credibility).

The record supports the district court's findings regarding the circumstances surrounding Fardan's interrogation. Based on the found circumstances, we hold that the district court properly imputed knowledge of potential adult prosecution to Fardan.

### B. Parental Presence

 Fardan next argues his father's absence from the interrogation should have weighed more heavily against finding a valid waiver of his *Miranda* rights. We have rejected a per se rule requiring parental presence, and have said that a request to speak to a parent does not automatically invoke the right to an attorney or the right to remain silent. *Burrell,* 697 N.W.2d at 593 (citing *State v. Hogan,* 297 Minn. 430, 440, 212 N.W.2d 664, 671 (1973)). As part of the totality of the circumstances review, however, we will closely examine "whether the juvenile is able to make a valid *Miranda* waiver without a parent's presence." *Burrell,* 697 N.W.2d at 594.

 The absence of a parent is not a compelling factor in assessing the validity of a waiver where the juvenile has not been in close contact with his parents, or has not requested their presence before speaking. *Williams,* 535 N.W.2d at 280–82, 288; *Hogan,* 297 Minn. at 432–33, 440–41, 212 N.W.2d at 666–67, 670–71. But, as Fardan notes, in *Burrell,* we concluded that a *Miranda* waiver was ineffective primarily because of the lack of a parent's presence. 697 N.W.2d at 597. In that case, the 16–year–old defendant's first words during the interrogation were for permission to call his mother; he requested that

twice more before his *Miranda* warning, and ten times after the warning. *Id.* at 595.

This case is easily distinguished from *Burrell.* In *Burrell,* the juvenile made multiple requests to speak with his mother *before* he indicated that he would waive his right to remain silent. 697 N.W.2d at 595. We relied on these early requests to conclude that Burrell "desired his mother's counsel." 697 N.W.2d at 595. By contrast, Fardan's single request for his father's presence to the arresting officers, which was not renewed with the interrogating officers until the end of the interview, does not demonstrate a desire or need for his father's counsel that is so strong that it calls into question the validity of Fardan's *Miranda* waiver.

In fact, the record demonstrates that Fardan was not intimidated, confused, or indecisive during the interrogation. Fardan's answers were generally argumentative, assertive, and often exculpatory. In addition, the district court rejected Fardan's testimony that the lack of his father's presence affected him. The record supports this finding. We hold that the absence of Fardan's father did not invalidate Fardan's waiver of his *Miranda* rights.

### C. Totality of the Circumstances

 Ultimately, Fardan argues that factors described above—the inadequate warning and the lack of his father's presence—combined with Fardan's limited ability to comprehend and the nature of the interrogation demonstrate that, under the totality of the circumstances, his *Miranda* waiver was not knowing, intelligent and voluntary. Specifically, Fardan relies on his diagnosis of Fetal Alcohol Effects/Neurobehavioral Disorder (alcohol exposed) and the length of his detention as other factors that demonstrate that his *Miranda* waiver was invalid.

In 2004, at the age of 14, Fardan had been evaluated by the Fetal Alcohol Spectrum Disorder Clinic. The evaluation determined that Fardan shows "minimal characteristics of Fetal Alcohol Spectrum Disorder," and diagnosed Fardan with Fetal Alcohol Effects/Neurobehavioral Disorder (alcohol exposed). The evaluation stated that Fardan was in the average range overall in cognitive abilities and academic achievement, and in the low end of the average range in functions such as memory, language, and adaptive behavior skills. The evaluation mentioned that Fardan "exhibits difficulty with impulsivity and disinhibition" in some behavioral areas.

The district court found that the Fetal Alcohol Effect report indicated that Fardan's disability did not affect his ability to make a valid *Miranda* waiver, and that Fardan had the necessary intelligence and capacity to understand the warnings. Our review of the record confirms that the district court correctly characterized the report's minimal diagnosis surrounding Fardan's intellectual development. Fardan was in the appropriate grade, and within average to low average in his academic and cognitive abilities. Although there was some concern of behavioral problems, these problems do not reflect on Fardan's ability to understand his rights.

With regard to the nature of the interrogation, although Fardan was denied requests for a cigarette, he did not appear to have any other physical deprivations. For much of the two-hour waiting time he was sleeping, and the interrogation itself was only about 52 minutes.

In sum, the preponderance of the evidence shows that Fardan made a knowing, intelligent, and voluntary waiver of his *Miranda* rights. We therefore hold that the district court did not err in admitting Fardan's statement.

## II.

■ Fardan next argues that the district court erred in allowing admission of his other offenses from the night of Brown's death. The evidence at issue is the evidence that was presented to the jury by way of the stipulation, as summarized in footnote 4. We review the district court's decision to admit the stipulation evidence for an abuse of discretion. *State v. Ness,* 707 N.W.2d 676, 685 (Minn.2006).[5]

■ Minnesota Rule of Evidence 404(b) states that "[e]vidence of another crime, wrong, or act is not admissible to prove the character of a person in order to show action in conformity therewith." Our "general exclusionary rule is grounded in the defendant's constitutional right to a fair trial." *State v. Ness,* 707 N.W.2d 676, 685 (Minn.2006) (citing *State v. Spreigl,* 272 Minn. 488, 495, 139 N.W.2d 167, 171 (1965)). The " 'overarching concern' " behind excluding such evidence is that it might "be used for an improper purpose, such as suggesting that the defendant has a propensity to commit the crime or that the defendant is a proper candidate for punishment for his or her past acts." *Id.* (quoting *State v. Washington,* 693 N.W.2d 195, 200–01 (Minn.2005)).

■ But evidence of other crimes, wrongs, or bad acts, also called *Spreigl* evidence, may be admitted for limited, specific purposes. We have recognized that evidence which relates to offenses that were a part of the " 'immediate episode for

---

5. We will use the term "stipulation evidence" to make our references to the evidence at issue in this case easily identifiable. Our analysis focuses on the underlying acts described by the stipulation, and does not depend on the fact that the evidence was submitted by stipulation.

which defendant is being tried' " may be allowed. *State v. Townsend*, 546 N.W.2d 292, 296 (Minn.1996) (citing *Spreigl*, 272 Minn. at 497, 139 N.W.2d at 173). In addition, Minn. R. Evid. 404(b) allows evidence that is used as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." [6] If the admission of such evidence is a close call, it should be excluded. *Ness*, 707 N.W.2d at 685.

The district court admitted the stipulation evidence at issue for two purposes: First, the court said that the connection in time, place, and conduct of the perpetrators between the murder and the later offenses was "all part of the same immediate episode." Second, the court found that the stipulation evidence was relevant to intent and lack of accident and that the evidence showed "the defendant's state of mind to do bad things." We examine each basis for the admission of the evidence in turn.

## A.

■ Fardan contends that the district court abused its discretion in admitting the stipulation evidence as "immediate episode" evidence. Specifically, Fardan argues that the court's reliance on the "immediate episode" exception was misplaced because Brown's murder could be proved without reference to Fardan's other offenses that night and because there was not a close enough nexus between Brown's murder and the other offenses. We agree.

In order for offenses to be part of the same "immediate episode," the offenses must be "linked together in point of time or circumstances so that one cannot be fully shown without proving the other." *State v. Kendell*, 723 N.W.2d 597, 608 n. 9 (Minn.2006) (internal quotation marks and citation omitted). In *Kendell*, police found the defendant's girlfriend and two children shot in her apartment, unit 304. *Id.* at 603. Police found a neighbor shot to death in the open doorway of unit 303, the apartment next door. *Id.* at 603. The defendant was charged with crimes in connection with the shootings in unit 303 and with the murder in unit 304. The issue we decided was whether the district court erred by not severing the shootings from the murder. *Id.* at 607. We affirmed the district court, in part because we determined that evidence of the shootings in unit 304 would have been admitted in the trial for the murder in unit 303 under the "immediate episode" exception to the other-crimes exclusion rule. *Id.* at 608. We relied on the facts that the crime in unit 303 was committed to avoid apprehension for the crime committed in unit 304, the immediate timing, and the close proximity of the crimes to conclude that the shootings in unit 304 were "part of one transaction" with the murder in unit 303. *Id.* at 608–09 (quotation and citation omitted).

There is no such connection between the offenses at issue here. In this case, Brown's robbery and murder were concluded before the other offenses occurred, and those offenses occurred after at least

---

**6.** In determining the admissibility of Rule 404(b) evidence, a five-step process must be satisfied, where:

(1) the state must give notice ...; (2) the state must clearly indicate what the evidence will be offered to prove; (3) there must be clear and convincing evidence that the defendant participated in the prior act; (4) the evidence must be relevant and mate-

rial to the state's case; and (5) the probative value of the evidence must not be outweighed by its potential for prejudice to the defendant.

*Ness*, 707 N.W.2d at 685–86. Fardan does not dispute that the first three steps were satisfied. His challenge focuses on the last two steps of the process, and our analysis therefore examines only these two steps.

an hour had passed. Brown's murder was not committed to facilitate the other offenses, and the other offenses .were not committed to facilitate Brown's murder. It is true that the identity of the perpetrators of all of the offenses was the same, and that the other offenses and those committed against Brown were all committed as part of the same broad plan to commit robbery. But this limited connection is not sufficient to make the other offenses part of the "immediate episode" of Brown's robbery and murder. We therefore hold that the district court abused its discretion in admitting the stipulation evidence as part of the same "immediate episode."

### B.

Fardan also argues that the district court abused its discretion in admitting the stipulation evidence as probative of his intent or lack of accident. Fardan contends that the offenses in the stipulation evidence are not similar enough to Brown's shooting to be probative of whether he intended to kill Brown. Fardan also argues that the district court admitted the stipulation evidence to show only that Fardan had the intent to commit "bad" or "violent" acts, which Fardan argues is impermissible propensity evidence under Rule 404(b). Finally, Fardan argues that any probative value the evidence might have had was substantially outweighed by its potential to unfairly prejudice Fardan by inflaming the prejudice of the jury.

To properly assess the relevancy and probative value of the evidence, the district court must first " 'identify the precise disputed fact to which the *Spreigl* evidence would be relevant.' " *Ness,* 707 N.W.2d at 686 (quoting *Angus v. State,* 695 N.W.2d 109, 120 (Minn.2005)). Here, the district court identified two disputed facts on which the stipulation evidence was relevant: whether Fardan intended to kill Brown, and whether the shooting was an accident. After stating that the evidence was relevant to show intent and lack of accident, the district court went on to say that the evidence was "highly relevant to show a callous attitude, which is highly probative of an intentional shooting." This statement appears to suggest that Fardan had a propensity to commit the crime because of a callous attitude. We agree with Fardan that this is an improper basis upon which to admit *Spreigl* evidence. But we still must examine whether the other rationale cited by the district court provides a proper basis upon which to admit the stipulation evidence.

*Spreigl* evidence may be admitted as relevant to the defendant's criminal intent, and the closely associated issue of absence of accident. *State v. Chambers,* 589 N.W.2d 466, 476–77 (Minn.1999); *see also State v. Grilli,* 304 Minn. 80, 86–87, 230 N.W.2d 445, 451 (1975) (upholding admission of bad acts evidence to rebut defense of entrapment). The admission of such evidence "requires an analysis of the kind of intent required and the extent to which it is disputed in the case." *Ness,* 707 N.W.2d at 687 (citing 8 Henry W. McCarr & Jack S. Nordby, *Minnesota Practice–Criminal Law and Procedure* § 32.19, at 452 (3d ed.2001)).

For example, in *Chambers,* the defendant had been convicted of first-degree murder for fleeing police in a stolen car, which had resulted in a police officer's death. 589 N.W.2d at 470–71. We affirmed the admission of the defendant's prior high-speed attempt to flee police and prior statements that he would do whatever it took to escape police. *Id.* at 476–77. We said the court had not abused its discretion in admitting the evidence because it was probative of whether the defendant intended to kill the police, or whether the death was an accident. *Id.* at 477. Con-

versely, in *State v. Courtney*, we concluded that *Spreigl* evidence of a domestic assault was erroneously admitted to inform on the defendant's intent to point a gun at a police officer. 696 N.W.2d 73, 83–84 (Minn.2005). The two different crimes were close in time and occurred at the same location, but "the description of [the] domestic assault [shed] no light on whether or why [the defendant] pointed a gun" at the officer. *Id.* at 84. With these general principles in mind, we examine the stipulation evidence.

### 1. Robbery, burglary, kidnapping and shootings into the trunk

■ The stipulation identified Fardan as having the gun when the group approached and then robbed a couple. The stipulation also described how the perpetrators stole the couple's car, took money out of their bank account by using an ATM machine, burglarized their house, locked the couple in the trunk of a car and later then released them in the middle of the freeway. Finally, the stipulation stated that one of the four perpetrators shot the gun three times into a closed trunk, the trunk into which the group had forced the couple.[7]

The district court properly admitted evidence of these offenses because the evidence was probative of Fardan's claim that the gun fired accidentally during the robbery of Brown. The gun Fardan used to confront the couple was the same gun Fardan used when he confronted Brown. This same gun was used to shoot into the trunk. If the gun had accidentally fired earlier in the evening, as Fardan contended in his statement, the jury could reasonably conclude that Fardan and the others would not continue using it to commit additional offenses later that night. If the gun were misfiring, members of the group, or even Fardan himself, could have been injured if the gun were used. Yet, Fardan continued to carry the gun around from one crime scene to the next and the group continued to use the gun to confront victims. Fardan's continued use of the gun was close to the time and place of his use of the gun in Brown's robbery and shooting and was therefore relevant to the only real issue in the case: whether the gun fired accidentally, as Fardan contended, or whether Fardan fired the gun intentionally, as the State contended.[8]

---

**7.** Although the stipulation said that one of the four men shot into the trunk, the district court judge, who also presided over the first trial, heard evidence during that trial that Fardan was the one who fired the rifle into the trunk. A portion of Fardan's videotaped statement was played where Fardan said another co-conspirator shot the gun, but the investigators stated that two of Fardan's co-conspirators named Fardan as the shooter. One of those co-conspirators also testified at the first trial that Fardan shot into the trunk. For this shooting, Fardan was charged and found guilty of two counts of second-degree assault under Minn.Stat. § 609.222, subd. 1.

**8.** The dissent argues that the stipulation evidence cannot be used to demonstrate absence of accident because accident was not properly at issue. We disagree. During closing arguments, defense counsel heavily emphasized that Fardan did not have to prove accident, and that the State had not proved an intent to kill. Defense counsel also reminded the jury that "the police said, '[w]as it an accident,' and Amani Fardan said '[y]eah,' but somehow the prosecution argued that it wasn't an accident."

Although Fardan never argues it, the dissent also asserts that the claim of accident was created from an "otherwise inadmissible answer" that Fardan gave to police. The dissent states that when the State has moved to exclude exculpatory portions of police statements, those portions are generally considered hearsay until a defendant testifies. But the cases cited by the dissent are not applicable in this case, as they involve defendants trying to admit statements they made out of court for the "truth of the matter asserted"—that the defendants were innocent.

Even though we find the evidence relevant, we must also examine whether its probative value outweighs its potential for unfair prejudice. For this determination, we balance the relevance of the other offenses, the risk of the evidence being used as propensity evidence, and the State's need to strengthen weak or inadequate proof in the case. *See Ness*, 707 N.W.2d at 689–91; *see also* 1 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 4:30, at 776–78 (3d ed.2007). As explored above, the other offenses happened relatively close in time and place to the offenses against Brown, and the use of the same weapon in furtherance of committing the other offenses connects the nature of those offenses to Brown's murder. The evidence, however, was not so similar or presented with enough detail that it would cause the jury to convict based on the other offenses rather than the charged crime. *See State v. Bolte*, 530 N.W.2d 191, 197 n. 3 (Minn.1995). Lastly, the State needed the evidence to combat Fardan's statement that Brown's shooting was an accident. Based on all of these factors, we hold that the district court did not abuse its discretion in admitting the evidence of the later robbery, burglary, kidnapping and shootings into the trunk.

### 2. Criminal sexual conduct

The jury was also told that Fardan sexually assaulted a woman twice. The court allowed the evidence because it showed "the defendant's state of mind to do bad things." Using *Spreigl* evidence to show a "state of mind to do bad things"

improperly suggests that the defendant has a propensity to commit crimes or that the defendant is a proper candidate for punishment for other crimes. Although close in time and place to the offenses against Brown, the evidence of Fardan's criminal sexual conduct has the weakest relationship to Fardan's intent to kill or the lack of accident. The conduct did not further the group's robbery plans—the thread that, according to the district court and State, tied the events of the entire night together. Further, the nature of the criminal sexual conduct was not similar to the events surrounding Brown's shooting; the victims were accosted in different ways and subjected to very different forms of violence. Finally, the stipulation contained no evidence that the gun used to kill Brown was used to facilitate the sexual assault. The evidence of Fardan's criminal sexual conduct therefore provides little to no insight on Fardan's state of mind when he shot Brown.

We further conclude that the minimal probative value of the criminal sexual conduct evidence was outweighed by its potential for unfair prejudice. Commentators have recognized that evidence of criminal sexual conduct can be highly prejudicial. *See* Mueller & Kirkpatrick, *supra*, § 4:30, at 776 (stating that crimes of a sexual nature are likely "to strike raw nerves and bring high risks of prejudice in any kind of prosecution"). Because the prejudicial impact of the criminal sexual conduct evidence outweighs any limited probative value, we hold that it was an

---

*See United States v. Sadler*, 234 F.3d 368, 372 (8th Cir.2000); *State v. Mills*, 562 N.W.2d 276, 286–87 (Minn.1997). In those situations, the exculpatory statement must be properly admitted as an exception to the hearsay rule, which may require the defendant to testify. *See* Minn. R. Evid. 801(d)(1)(B); *State v. Bobadilla*, 709 N.W.2d 243, 257 (Minn.

2006). In this case, however, the State submitted the statement, and a statement made by a party offered against him at trial is not hearsay. Minn. R. Evid. 801(d)(2)(A); *State v. Reed*, 737 N.W.2d 572, 590 (Minn.2007). Therefore, the statement was properly admitted.

abuse of discretion to admit evidence of Fardan's criminal sexual conduct.

Having concluded that the district court abused its discretion in allowing evidence of the criminal sexual conduct, we must determine whether that error was reversible error. *State v. Stewart*, 643 N.W.2d 281, 298 (Minn.2002) (assessing whether erroneously admitted other crimes evidence warranted a new trial). The defendant bears the burden of demonstrating that he "was prejudiced by the admission of the evidence." *State v. Slowinski*, 450 N.W.2d 107, 113 n. 1 (Minn. 1990) (citing *State v. Loebach*, 310 N.W.2d 58, 64 (Minn.1981)). To warrant a new trial, the erroneous admission of *Spreigl* evidence must create "a reasonable possibility that the wrongfully admitted evidence significantly affected the verdict." [9] *Ness*, 707 N.W.2d at 691 (citing *State v. Bolte*, 530 N.W.2d 191, 198 (Minn.1995)). If such a possibility exists, the error in admitting the evidence was prejudicial error, warranting a new trial. *Bolte*, 530 N.W.2d at 198.

In *Courtney*, we determined that there was not a reasonable possibility that the erroneously admitted *Spreigl* evidence significantly affected the verdict. 696 N.W.2d at 84. Several factors drove us to this conclusion. We noted that other evidence on the issue for which *Spreigl* evidence was offered was presented, the court gave a limiting instruction, and the State did not dwell on the evidence in its closing argument. *Id.*

Similar circumstances exist in this case. The State offered other evidence that supported the conclusion that Fardan intended to kill Brown: Fardan brought a loaded rifle to a robbery, pointed the gun at a vital part of Brown's body and at close range, and he pulled a normally working trigger. Indeed, in seeking to exclude the stipulation evidence as unnecessary, the defense argued that the other evidence of Fardan's intent was "incredibly powerful." The district court instructed the jury to limit the use of the stipulation evidence both before the stipulation was read and in the jury instructions given at the close of the case. The jury is presumed to have followed such instructions. *Courtney*, 696 N.W.2d at 84. While the State mentioned the stipulation in its closing argument, the State did not mention Fardan's criminal sexual conduct. Moreover, the State's comments regarding the stipulation were brief, and the State specifically highlighted that the jury should use the evidence in the stipulation for the limited purpose of the question of "intent or absence of mistake" and that jury was "not sitting in judgment of any other offenses that Mr. Fardan may or may have committed." Lastly, the jury heard about the criminal sexual assault through a reading of an edited stipulation, not through live testimony from the victim of the sexual assault. *See State v. Clark*, 738 N.W.2d 316, 347–48 (Minn.2007). We conclude that there is no reasonable possibility that the erroneous admission of Fardan's criminal sexual con-

---

**9.** In *Townsend v. State*, 646 N.W.2d 218, 223 (Minn.2002), we determined that the erroneous admission of *Spreigl* evidence was harmless under the "surely unattributable" test. However, the issue in *Townsend* was whether the court should have considered additional factors when determining the impact of the error on the jury's verdict. *Id.* at 222–23. We concluded that even if those factors were considered, Townsend failed to satisfy even

the "surely unattributable" test; that conclusion should not be read as requiring the application of the surely-unattributable test to an erroneous admission of *Spreigl* evidence that does not involve a constitutional error. Moreover, the parties in this case do not contend that we should utilize a test other than the one we applied in *Ness* to assess whether the error was reversible.

duct significantly affected the jury's verdict, and hold that the district court's erroneous admission of the evidence was not reversible error.

### III.

 Fardan next argues that the evidence is not sufficient to establish beyond a reasonable doubt that he intended to kill Brown; he asserts that the evidence shows that the shooting was an accident, or at the very least, that he intended only to injure Brown. When reviewing whether evidence is sufficient to support a conviction, we " 'view the evidence in the light most favorable to the verdict and assume that the factfinder disbelieved any testimony conflicting with that verdict.' " *State v. Holliday*, 745 N.W.2d 556, 562 (Minn.2008) (citing *State v. Leake*, 699 N.W.2d 312, 319 (Minn.2005)). The verdict should not be disturbed if the jury could reasonably conclude, given the presumption of innocence and the requirement of proof beyond a reasonable doubt, that the defendant was guilty of the charged offense. *State v. Crow*, 730 N.W.2d 272, 280 (Minn.2007).

A defendant who "causes the death of a human being with intent to effect the death of the person or another, while committing or attempting to commit ... aggravated robbery" is guilty of first-degree murder. Minn.Stat. § 609.185(a)(3). A person who causes the death of another during aggravated robbery without intent is guilty of second-degree murder. Minn. Stat. § 609.19, subd. 2(1). "With intent to" is statutorily defined as meaning "that the actor either has a purpose to do the thing or cause the result specified or believes that the act, if successful, will cause that result." Minn.Stat. § 609.02, subd. 9(4) (2008).

 We have said that " '[i]ntent is an inference drawn by the jury from the totality of circumstances.' " *State v. Bick-*

*ham*, 485 N.W.2d 923, 926 (Minn.1992) (quoting *State v. Raymond*, 440 N.W.2d 425, 426 (Minn.1989)). In *Bickham*, the defendant approached the victim from behind, shoved him into a door, put a pistol to the victim's head and shot him, then took the victim's briefcase. *Bickham*, 485 N.W.2d at 924–25. We concluded that evidence that the defendant was armed with a pistol when he accosted the victim and shot him at close range would "alone" be sufficient for the jury's finding of intentional murder. *Id.* at 926; *see also State v. Young*, 710 N.W.2d 272, 279 (Minn.2006) (supporting verdict of intentional killing based in part on the fact that a loaded gun was brought to the burglary); *State v. Harris*, 405 N.W.2d 224, 229 (Minn.1987) (noting that intent may be inferred from the way victim was shot); *State v. Campbell*, 281 Minn. 1, 12, 161 N.W.2d 47, 55 (1968) (obtaining a loaded handgun for the purpose of carrying out a robbery raises a permissible inference of intent to kill). A victim's lack of resistance or struggle can also go toward a finding of intent. *Bickham*, 485 N.W.2d at 926. Leaving an incapacitated victim to die also supports an inference of intent. *State v. Dimmick*, 586 N.W.2d 127, 129 & n. 7 (Minn.1998) (citing *State v. Raymond*, 440 N.W.2d 425, 426 (Minn.1989)).

 Fardan argues that the way he shot Brown does not demonstrate an intent to kill because Fardan did not point the gun at Brown's head or chest and he fired the gun only once. We disagree.

Viewing the evidence in the light most favorable to the verdict, there is reasonable support for the jury's conclusion that Fardan acted with intent to kill Brown. The group of boys had discussed how they would commit the robberies. Consistent with this plan, Fardan brought a loaded gun out of the car to accost Brown. The gun, although having a taped handle, was

functioning normally. Fardan stood 3 to 5 feet away from Brown, pointed the gun at Brown, and shot Brown in the abdomen, a vital part of the body. Fardan then left Brown lying on the ground, still alive and bleeding. We hold that the evidence was sufficient to support the conviction for intentional felony murder.

## IV.

Fardan next argues that the district court erred by making his sentence of life imprisonment consecutive to his earlier 486–month sentence rather than concurrent. Under the Minnesota Sentencing Guidelines, the district court may, without departing, impose a first-degree murder sentence consecutive to a prior sentence for the crimes of which Fardan was first convicted. Minn. Sent. Guidelines II.F.02, VI; Minn.Stat. 609.15 (2008). When consecutive sentences are permissive, we will not reverse the imposition of such a sentence absent a clear abuse of discretion. *State v. McLaughlin*, 725 N.W.2d 703, 715 (Minn.2007). We " 'do not interfere with a trial courts discretion in sentencing unless the sentence is disproportionate to the offense' or 'unfairly exaggerates the criminality of the defendants conduct.' " *Id.* (quoting *State v. Sanchez–Diaz*, 683 N.W.2d 824, 837 (Minn.2004)); *see* Minn. Stat. § 609.15. We look to past sentences received by other offenders in determining whether the district court abused its discretion. *Ouk*, 516 N.W.2d at 186.

Fardan alleges that making his life sentence consecutive to his previous 486–month sentence is disproportionate to the offense and unfairly exaggerates the criminality of his conduct. Specifically, Fardan contends that his age and Fetal Alcohol Effects diagnosis and the nature of Browns killing should mitigate against a consecutive sentence. In imposing the consecutive sentence, the district court stated that a concurrent sentence would demean the criminality of the separate acts and the separate victims. The court found that the crime at issue was a "senseless killing" of a defenseless man who put up no resistance; the court then cited to our decisions in *Ouk, Brom,* and *McLaughlin* as evidence that consecutive sentences have been upheld where youthful offenders were involved.

We have upheld consecutive sentences that involved youthful offenders numerous times. In *McLaughlin*, the 15–year–old defendant was found guilty of second-degree murder of one fellow student, and first-degree murder of another. 725 N.W.2d at 708. We concluded that the district court did not abuse its discretion in imposing a 144–month sentence consecutive to a life sentence. *Id.* at 717; *see also Ouk*, 516 N.W.2d at 184–86 (affirming consecutive life sentences and 180–month sentences for 15–year–old defendant convicted of two counts of first-degree murder and two counts of attempted first-degree murder); *State v. Brom*, 463 N.W.2d 758, 765 (Minn.1990) (holding that the district court did not abuse its discretion when it sentenced a 16–year–old defendant to three consecutive life terms). We have affirmed consecutive sentences where there are multiple victims to the defendant's crimes, even when only one victim is killed. *See State v. Lee*, 491 N.W.2d 895, 899, 902 (Minn.1992) (affirming consecutive sentences of life imprisonment for murder, and 180 months and 240 months for two attempted murders). Additionally, we have cited factors such as close-range shootings and defenseless victims as support for upholding consecutive sentences. *See McLaughlin*, 725 N.W.2d at 716.

In light of these holdings, Fardan's arguments that consecutive sentences unduly exaggerate the criminality of his conduct have no merit. Fardan's age does not

eradicate culpability, and Fardan's Fetal Alcohol diagnosis is not severe enough to constitute a mitigating factor in sentencing. *Cf. McLaughlin*, 725 N.W.2d at 716 (stating that for mental illness to be a mitigating factor during sentencing, "a defendant's impairment must be 'extreme' to the point that it deprives the defendant of control over his actions"). The district court considered Fardan's multiple victims, the senseless nature of the killing, and Brown's lack of resistance or defense in ordering the sentences to be served consecutively. The evidence supports the court's findings, and we hold that the court did not abuse its discretion in sentencing.

## V.

▮ Fardan's final argument is that the district court erred in formally adjudicating Fardan guilty of first-degree felony murder, second-degree felony murder, and first-degree aggravated robbery. The warrant of commitment reflects that Fardan was convicted of all three crimes. Minnesota Statutes § 609.04 (2008) prohibits convictions on both a crime charged and an included offense. The definition of "included offense" incorporates those offenses that are "[a] lesser degree of the same crime" or "necessarily proved if the crime charged were proved." Minn.Stat. § 609.04, subd. 1(1), (4). Second-degree felony murder is a lesser degree of first-degree felony murder. The aggravated robbery was an offense "necessarily proved" as part of the first-degree felony murder charge, which alleged that Fardan shot Brown during the commission of an aggravated robbery. *See Spann v. State*, 740 N.W.2d 570, 573–74 (Minn.2007). The law reflects, and the State concedes, that Fardan's convictions should merge. Accordingly, we vacate the convictions for the included offenses of second-degree felony

murder and first-degree aggravated robbery involving Brown.

Affirmed as modified.

PAGE, Justice (concurring).

I concur in the result. I disagree, however, with the court's analysis of law enforcement's failure to allow Fardan to have access to his father before his first interrogation.

Ordinarily, the State will be deemed to have met its burden of proving a knowing, voluntary, and intelligent waiver of *Miranda* rights if it shows that a *Miranda* warning was given and that before talking with the police the individual indicated that he understood his *Miranda* rights. *State v. Camacho*, 561 N.W.2d 160, 168 (Minn. 1997). However, if there is evidence indicating that the waiver was not knowing, voluntary, and intelligent, the district court must make a subjective factual inquiry to determine whether, under the totality of the circumstances, the waiver was knowing, voluntary, and intelligent. *Id.* When making its inquiry, the court is to consider such factors as age, maturity, intelligence, education, experience, and ability to comprehend; the lack or adequacy of warnings; the length and legality of the detention; the nature of the interrogation; physical deprivations; and limits on the individual's access to counsel, friends, and others. *Id.*

In *State v. Burrell*, 697 N.W.2d 579, 597 (Minn.2005), we concluded that Burrell's waiver of his *Miranda* rights was ineffective because of the lack of a parent's presence. Here, the court distinguishes *Burrell* on the basis that in *Burrell* the 16–year–old defendant, who was arrested by the police just before noon, made three requests to talk to his mother before he was interrogated and ten more after the interrogation began, while Fardan made only one request before he was interrogated and one at the end of the interrogation.

Based on these distinctions, the court concludes that Fardan's waiver was knowing, voluntary, and intelligent. Although the facts of this case are somewhat different than those in *Burrell,* they are sufficiently similar to compel the same conclusion—Fardan's waiver of his *Miranda* rights was ineffective because of the lack of a parent's presence.

Fardan, at the age of 15 years, 2 months, was arrested at a friend's house sometime shortly before midnight on October 14, 2005. His father was nearby at the time and told the arresting officers that he wanted to be present if Fardan was questioned. After his arrest, Fardan, who had no previous experience with the adult criminal justice system, was transported in handcuffs to city hall. Upon arriving at city hall, Fardan asked the officers who had transported him "if [his] dad could be present, like, he can be with me" and the officers responded saying "he will." Contemporaneously, Fardan's father drove to city hall where he reiterated to law enforcement officers that he wanted to be present for any questioning of his son. Although arrested sometime before midnight, Fardan's interrogation did not begin until approximately 3:25 a.m. Fardan spent much of the time between his arrival at city hall and the beginning of his interrogation alone in an interview room. At some point around 3 a.m. Fardan's father was told that he was not going to be able to see his son and that he might as well go home, which he did.

Interestingly, after not being given access to his father during that first interrogation, when law enforcement officers sought to interrogate him again on October 17, 2005, Fardan emphatically requested his father saying that he did not want to answer questions by himself, that he would feel more comfortable with his father present, and that he wanted his father immediately. While this second interrogation took place two days after the first interrogation, Fardan's emphatic request to have his father present sheds light on his mental state throughout the interrogation process, as evidenced by his testimony at the pretrial hearing. When asked why he had not requested, during the interrogation, to have his father present, Fardan explained that he relied on the fact that he had been told that he would be allowed to see his father. When questioned about why he requested his father's presence at the outset of the second interrogation, Fardan responded, "I knew they wasn't going to do it like they did the first time. Like, I know I had to ask in the beginning to make sure he was going to be there." In addition, this second interview sheds light on law enforcement's failure to allow Fardan's father to be present at the first interrogation. The detective who conducted the second interrogation responded to Fardan's request for his father by attempting to convince Fardan to give a statement in the absence of his father and, when unsuccessful, terminated the interrogation.

Given these facts, I conclude that Fardan's waiver of his *Miranda* rights was ineffective because of the lack of his father's presence. Therefore, I also conclude that Fardan's statement was admitted in error. Nevertheless, I would affirm Fardan's convictions because the error in admitting the statement was harmless beyond a reasonable doubt in that Fardan's convictions were "surely unattributable" to that error. *Burrell,* 697 N.W.2d at 597 (error is harmless beyond a reasonable doubt "if the verdict is 'surely unattributable' to the error") (internal citations omitted).

ANDERSON, PAUL H., J. (concurring).

I join in the concurrence of Justice PAGE.

MEYER, Justice (dissenting).

I respectfully dissent. I would hold that the district court erred in admitting the other crimes evidence. The crimes were not probative of an intent to kill or necessary to rebut a claim of accident. Appellant neither asserted nor put on a defense of accident. The State created the claim from an otherwise inadmissible answer appellant gave to the police in the confession that appellant sought to suppress. And the deplorable nature of the crimes posed such serious risks for unfair prejudice as to warrant exclusion. I would also hold that the other crimes evidence deprived appellant of his right to a fair trial.

My disagreement with the majority begins, fundamentally, with the term "stipulated evidence." Over an hour after the shooting in North Minneapolis, appellant, Brewer, Graves, and Jourdain were driving around South Minneapolis when they happened upon a couple leaving a grocery store. The group robbed the couple at gunpoint, locked them in the trunk of a car, burglarized their apartment, stole their belongings (as appellant sexually assaulted the houseguest), fired three shots into the closed trunk, and eventually released the couple naked on the freeway. It was only after the court's ruling to admit this evidence, made near the end of the state's case-in-chief, that defense counsel agreed to submission of the evidence by stipulation instead of live testimony. The issue, more properly stated then, is whether the district court erred in admitting evidence of violent and heinous criminal acts occurring over an hour after the charged crime of first-degree felony murder to show intent to kill.

"Evidence of another crime, wrong, or act is not admissible to prove the character of a person in order to show action in conformity therewith." Minn. R. Evid. 404(b).[1] Other crimes may be admitted to prove certain facts such as intent or absence of mistake or accident, but *only* if "the probative value of the evidence is not outweighed by its potential for unfair prejudice to the defendant." *Id.* Rule 404(b) is a rule of exclusion:

> [Rule 404(b)] bars not evidence as such, but a theory of admissibility. The risk that a jury will draw a deadly and decidedly improper three-step inference, from bad act to bad person to guilty person or give way to the emotional impulse to punish because the other act alone shows that punishment is deserved.

1 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 4:28, at 746 (3d ed.2007) (internal citations omitted) (internal quotation marks omitted). If the decision to admit the evidence is a close call, the evidence should be excluded.

1. Minn. R. Evid. 404(b) provides:

Evidence of another crime, wrong, or act is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In a criminal prosecution, such evidence *shall not be admitted unless* (1) the prosecutor gives notice of its intent to admit the evidence consistent with the rules of criminal procedure; (2) the prosecutor clearly indicates what the evidence will be offered to prove; (3) the other crime, wrong, or act and the participation in it by a relevant person are proven by clear and convincing evidence; (4) the evidence is relevant to the prosecutor's case; and (5) the *probative value of the evidence is not outweighed by its potential for unfair prejudice* to the defendant. Evidence of past sexual conduct of the victim in prosecutions involving criminal sexual conduct, including attempts or any act of criminal sexual predatory conduct is governed by rule 412.

(Emphasis added.)

*State v. Ness,* 707 N.W.2d 676, 685 (Minn. 2006).

*Res Gestae/Immediate Episode.* The district court admitted the other crimes evidence as res gestae or immediate episode evidence. The concept of proving inseparable crimes is sometimes "summed up in the mind-numbing and elastic term 'res gestae,' which pretends much but means little." 1 Mueller & Kirkpatrick, *supra,* § 4:33, at 809. The label "res gestae," or "inextricably intertwined offenses," can serve as a "catchall for admitting acts that are far more prejudicial to the defendant than useful in determining guilt of the charged offense." *Id.* I join the majority's analysis that the other crimes evidence was not admissible as immediate episode evidence merely because the crimes followed the murder, or that they involved the same people or were committed as part of a broad plan to commit random robberies.

*Specific Intent.* The district court concluded the other crimes were probative of intent to kill, explaining that the crimes were "highly relevant to show a callous attitude, which is highly probative of an intentional shooting." But the first-degree felony murder charge required an intent to kill, not just an intent to shoot. Appellant's not guilty plea put specific intent in issue.[2]

For the criminal events in South Minneapolis, appellant was convicted of aiding and abetting the shooting into the trunk of the car. We have recognized that crimes committed after the charged offense can be relevant to show common scheme or plan, to refute claims of fabrication, and to rebut claims of entrapment.[3] But the intent to aid and abet an assault does not inform the analysis of a prior intent to take a life without implicating propensity. In support of allowing the evidence, the State argued: "Well, we don't know who fired into the trunk," but "the intent of continuing to commit a crime spree armed with the same rifle shows [appellant's] intent to commit a crime at the beginning of the evening."[4] Other crimes evidence is not saved from exclusion because it supports an inference "like intent if the necessary logical steps include an inference of general character or propensity, or if it seems likely that the proof will be *used* to support such an inference." 1 Mueller & Kirkpatrick, *supra,* § 4:28, at 746–47 (emphasis original). The State's rationale for admitting the other crimes involved propensity inferences prohibited by Rule 404(b). *See Angus v. State,* 695 N.W.2d 109, 122 (Minn.2005) ("[U]sing a criminal act to demonstrate a defendant's propensity is prohibited.").

*Absence of Accident.* The majority concludes the other crimes evidence was nec-

---

2. The majority concludes the district court's ruling was improperly based on propensity inferences and then moves on to address "the only real issue," whether the gun fired accidentally or that appellant fired the gun intentionally.

3. *E.g., State v. Lynch,* 590 N.W.2d 75, 78–79, 81 (Minn.1999) (holding that evidence of subsequent aggravated robbery was admissible for the purpose of showing identity and modus operandi in felony murder trial); *State v. Kennedy,* 585 N.W.2d 385, 391–92 (Minn. 1998) (holding that evidence of subsequent sexual assault crimes properly offered to re-

fute defendant's claim that victim's testimony was a fabrication in criminal sexual conduct trial); *State v. Lynard,* 294 N.W.2d 322, 323–24 (Minn.1980) (holding that evidence of subsequent crimes may be admitted to rebut a claim of entrapment).

4. The majority suggests that appellant fired the shots into the trunk. Appellant was convicted of criminal sexual conduct using force. He was acquitted of criminal sexual conduct using a dangerous weapon and kidnapping in order to terrorize. Both the State and the court noted that they did not know who fired those shots.

essary to refute a claim that the shooting in North Minneapolis was an accident. But it was the State, not appellant, who put accident in issue. The State raised the claim in its opening statement by reference to appellant's confession and then proceeded to outline the expert evidence that would show "there is no defect in that rifle that would cause it to fire accidentally." Neither appellant nor his attorney claimed accident; no witness alluded to accident; and no such claim was suggested through cross-examination of the State's witnesses.

The only reference that the gun fired accidentally was a statement appellant made in response to a suggestion by police investigators. During appellant's interrogation, the following exchange occurred:

Q. So why did you shoot the man?

A. I didn't even want to.

Q. I know it, was it an accident?

A. Yeah.

Q. You were going for the legs or what?

A. No, I was scaring him, the trigger kinda slipped.

. . . .

Q. How do you feel about, ah, killing that man up there? Any sense of remorse or do you just think it was an accident?

A. It was an accident.

"Yeah ... the trigger kinda slipped.... It was an accident." Nine words embedded in a 52–minute police statement served as grounds for the State's claim of need for the other crimes. And appellant attempted to suppress this statement.

Subject to various exclusionary rules, police statements may be admissible as party admissions.[5] But the exculpatory portions of police statements are typically excluded, on the State's motion in limine, as inadmissible hearsay unless and until the defendant testifies. " 'Hearsay' is a statement ... offered in evidence to prove the truth of the matter asserted." Minn. R. Evid. 801(c). But "[a] statement is not hearsay if ... [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... consistent with the declarant's testimony and helpful to the trier of fact in evaluating the declarant's credibility as a witness...." Minn. R. Evid. 801(d). Consequently, exculpatory portions of a defendant's police statement are excluded when the defendant does not testify. *E.g., State v. Bobadilla*, 709 N.W.2d 243, 256–57 (Minn.2006) (explaining that exculpatory statements in police statement were not admissible because the cross-examination requirement had not been satisfied), *vacating conviction on other grounds sub nom. Bobadilla v. Carlson*, 570 F.Supp.2d 1098, 1112–14 (D.Minn. 2008); *State v. Mills*, 562 N.W.2d 276, 286–87 (Minn.1997) (concluding that exculpatory portions of police statement were inadmissible hearsay); *cf. United States v. Sadler*, 234 F.3d 368, 372 (8th Cir.2000) (stating that exculpatory statement allegedly made prior to confession was excludable hearsay).

What the State accomplished here was to present, in the guise of necessity, evidence that was not otherwise admissible. By placing the exculpatory portion of appellant's confession before the jury, the State effectively opened the door for the

---

**5.** *E.g., State v. Mitjans*, 408 N.W.2d 824, 830 (Minn.1987) (holding police statement admissible as party admission under Minn. R. Evid. 801(d)(2)). While a statement that qualifies as a party admission "cannot be excluded as hearsay, it may still be excluded on constitutional grounds, by statute or because of specific exclusionary provisions found elsewhere in the Rules...." 4 Mueller & Kirkpatrick, *supra*, § 8:44, at 369.

other crimes. I would conclude that the State cannot "create" a Rule 404(b) exception based on an excludable answer the defendant gave in a police statement that he sought to suppress. *Cf. State v. Dexter*, 269 N.W.2d 721, 721–22 (Minn.1978) (explaining that the State cannot misuse the rules to expose the jury to hearsay under the guise of impeachment when the sole purpose in calling the witness is to introduce the witness's prior statement); *Boyd v. State*, 399 Md. 457, 924 A.2d 1112, 1128 (2007) (stating rule that, as a prerequisite for application of Rule 404(b) mistake exception, defendant generally must make some assertion or put on a defense of mistake).[6]

In balancing the probative value of other acts evidence against the potential for unfair prejudice, the State's need for the evidence is addressed. *Ness*, 707 N.W.2d at 690 (Minn.2006). "The prejudice to an opponent can be said to be 'unfair' when the proponent of the evidence could prove the fact by other, non-prejudicial evidence." 22 Charles A. Wright & Kenneth A. Graham, Jr., *Federal Practice and Procedure: Evidence* § 5214, at 269 (1978). The State established absence of accident with forensic evidence. The firearms and toolmarks examiner testified that the gun was fully operational and had a trigger pull of 4–4½ pounds, which was normal for a gun of that type. The examiner explained that in order to fire the gun, one had to take a series of intentional steps: load the magazine with cartridges, disengage the safety, pull the slide back to chamber a cartridge, and pull the trigger. I would conclude that the State had a fair opportunity to establish absence of accident by the use of nonprejudicial evidence.

Even assuming the other crimes evidence had legitimate probative value, the nature of the acts carried serious risks for unfair prejudice. In deferring the decision on the admission of the evidence, the district court expressed concern that if admitted later, a juror might recall having read about the incident in the newspaper because "the releasing of the two people nude on the highway ... was a remarkable circumstance that distinguishes this case" from other crime reports. The State and the district court referred to the other crimes as random, senseless, and violent. "Where the acts (usually crimes) are heinous, violent or particularly shocking, they bring special risks of unfair prejudice." 1 Mueller & Kirkpatrick, *supra*, § 4:30, at 776.

The risks for improper propensity inferences were peculiarly high, as demonstrated by the colloquy at trial over relevance. At one point, the court thought the crimes showed intent by means of "a continued pattern of violence, senseless criminal activity." The State argued the crimes were relevant because appellant was part of the group still "committing violent acts, random, senseless acts of violence against multiple people." Even on appeal, the State used character and propensity to justify the evidence, stating the crimes showed that appellant "and his accomplices were on a spree and indulging an indifference to human life and dignity, conduct that was consistent with a senseless killing." The State suggested the other crimes were part of a "continuing plan [that] did not exclude other criminal opportunities that might arise, including the infliction of gratuitous suffering." At oral argument, the State told us the evidence showed that appellant and his accomplices "were engaging in multiple occasions in the infliction of pain and suffering on other people for their own entertainment." Because the heinous nature of the other

---

**6.** Both trial and appellate counsel protested the misuse of the evidentiary rules.

crimes posed such serious risks for involving propensity as well as arousing emotionalism and anger, and there was other nonprejudicial evidence to prove the alleged disputed fact, I would conclude the admission of the other crimes evidence was error.

When there is a reasonable possibility that wrongly admitted evidence significantly affected the verdict, a new trial is required. *Ness,* 707 N.W.2d at 691 (citing *State v. Bolte,* 530 N.W.2d 191, 198 (Minn. 1995)). In concluding that the erroneous admission of the criminal sexual conduct evidence was harmless error, the majority looked to other evidence on intent, the limiting instruction, the State's closing argument and presentation of the evidence by stipulation instead of live testimony. While the stipulation may have mitigated some damage, even the stipulation to the other crimes had power to sway. In certifying appellant for adult prosecution, the juvenile court described the accusations of murder, crimes against the couple, and sexual assault of the houseguest as "three extremely serious and shocking criminal events." In severing the murder from the other crimes in the prior trial, the district court recognized that "[j]oinder of the murder charge and the subsequent alleged offenses pose[d] greater danger of unfair prejudice."

It is true that the State did not dwell on the other crimes in closing argument, but the State did not need to given the nature of the acts. The State mentioned the crimes: the robbery, kidnapping, burglary and "some other serious crimes." The State reminded the jury that "at one point [the couple was] removed from the trunk of the car, told to strip naked, put back in the trunk of the car," and "shot inside the trunk of the car." The State noted that two discharged cartridge casings were "actually found in the clothes that they were

forced to take off." The State argued that because the other crimes were intentional acts, "so was the murder" of Brown. The State continued:

> Now, in the middle of this long chain of intentional acts, [appellant] doing one thing after another intentionally, intentionally, intentionally intentionally, we get to the pulling of the trigger and that one and that one alone is an accident? Oops? That's where the oops is? Everything else he does volitionally from arming himself to robbing, staying with the guys, to going on afterwards, everything is volitional, everything is intentional, except the one fact that really gets him in trouble for murder one, the intent. When [appellant] pulled that trigger, that was no accident. It was as intentional as everything else he did that night.

The precise disputed fact was whether appellant had the intent to kill. That appellant had the general intent to commit terrible crimes after the murder did not show the requisite intent for first-degree felony murder without involving propensity inferences.

The district court twice instructed the jury that the other-crimes evidence could only be used for the limited purpose of deciding whether appellant intended to kill Brown and could not be used for any other purpose. But the limiting instructions did not preclude the possibility that the jury, like the State and the district court, would "misuse" the evidence to support inferences of character and propensity. In the context of this trial, the limiting instructions more likely worked to highlight and "exacerbate[ ] its prejudicial effect" of the evidence that should not have been admitted in the first place. *State v. Strommen,* 648 N.W.2d 681, 687 (Minn.2002).

The Supreme Court has explained the basis for excluding character evidence:

"The state may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice."

*Old Chief v. United States,* 519 U.S. 172, 181, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) (quoting *Michelson v. United States,* 335 U.S. 469, 475–76, 69 S.Ct. 213, 93 L.Ed. 168 (1948)). Appellant had a right to a fair trial. U.S. Const. amend. VI, XIV; Minn. Const. art. I, §§ 6, 7. In fact, "[t]he general exclusionary rule is grounded in the defendant's constitutional right to a fair trial." *Ness,* 707 N.W.2d at 685. I recognize that given the nature of appellate review, with its restrictions to the record and deference to the district court's discretion, we rarely reverse the district court's judgment as to the admissibility of prior bad acts evidence. We have, however, intervened in the exceptional case. *E.g., Strommen,* 648 N.W.2d at 686–89. I believe this is the exceptional case. The other crimes evidence was heinous and violent, admitted in error, and misused by the State at trial and on appeal. I cannot deem the admission of this evidence as harmless. I would reverse appellant's conviction and remand for a new trial.